ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| JACKELINE BUTTER MATOS<br><br>Recurrida<br><br><br>V.<br><br><br>UNIVERSAL LIFE INSURNACE CO., Y OTROS<br><br>Peticionaria | KLCE202401108 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón |
| | | Civil Núm.: BY2021CV02793<br><br>Sala: 504 |
| | | SOBRE:<br><br>Ley de Represalia en el Empleo (Ley Núm. 115-1991) y Otros |

Panel integrado por su presidente el Juez Sánchez Ramos, el Juez Rivera Torres y el Juez Salgado Schwarz.

Salgado Schwarz, Carlos G., Juez Ponente

# **R E S O L U C I Ó N**

En San Juan, Puerto Rico, a 20 de noviembre de 2024.

Comparece Universal Group, Inc., ("Universal" o "Peticionaria"), y nos solicita que revoquemos la *Resolución* que emitió el Tribunal de Primera Instancia, Sala de Bayamón, ("TPI" o "foro recurrido"), el 3 de octubre de 2024.[2] Mediante dicho dictamen, el TPI declaró **Sin Lugar** la *Solicitud de Sentencia Sumaria* que presentó Universal y ordenó la continuación de los procedimientos.

Por los fundamentos que exponemos a continuación, denegamos expedir el auto solicitado.

---

[1] El recurso fue asignado a este panel por virtud de lo dispuesto en la Orden Administrativa OAJP-2021-086, de 4 de noviembre de 2021, sobre Normas para la Asignación de Recursos Nuevos Previamente Presentados en el Tribunal de Apelaciones. Como consecuencia de la referida orden, este recurso, así como todo recurso futuro que surja del caso de referencia, pendiente ante el Tribunal de Primera Instancia, será atendido por los integrantes de este panel, quienes adjudicaron el correspondiente recurso anterior (KLCE202300109).

[2] La *Resolución* fue registrada, archivada y notificada el 4 de octubre de 2024. Véase Apéndice del recurso de *certiorari*, pág. 129.

Número Identificador

RES2024_____

-I-

La señora Jackeline Butter Matos ("señora Butter" o "Recurrida") presentó una Querella por represalias en el empleo contra Universal, bajo el procedimiento sumario establecido por la Ley Núm. 2 de 17 de octubre de 1961.[3] Posteriormente, enmendó la Querella para incluir una reclamación adicional por despido constructivo, al amparo de la Ley Núm. 80 de 30 de mayo de 1976, *infra*.[4] Sostiene que Universal la indujo a renunciar a su empleo mediante la imposición de condiciones de trabajo más onerosas, vejámenes y rebajarla de categoría.

En respuesta, Universal negó la mayoría de las alegaciones. A su vez, levantó como defensas afirmativas, entre otras, que Universal Life Insurance Co. ("ULICO") mantiene políticas que prohíben el discrimen y las represalias en el empleo. Conforme a ello, sostuvo que a la señora Butter se le ha tratado de acuerdo con las normas y políticas de ULICO. Por tanto, solicitó al Tribunal declare No Ha Lugar la Querella y, en consecuencia, desestime la acción en cuanto a Universal Group, Inc., por no ser el patrono de la señora Butter.[5]

Más adelante, la Peticionaria presentó su *Contestación a la Querella Enmendada* en la que reiteró las alegaciones y defensas afirmativas esbozadas en la *Contestación a la Querella* original. No obstante, añadió como defensas adicionales, entre otras, que el TPI no adquirió jurisdicción sobre ULICO. Sostuvo, además, que

---

[3] 32 LPRA sec. 3118 *et seq.* Véase Apéndice del Recurso de *Certiorari*, págs. 1-21.
[4] 29 LPRA sec. 185e. *Íd.*, págs. 60-71.
[5] *Íd.*, págs. 22-57.

ULICO llevó a cabo las debidas investigaciones para atender las quejas de la señora Butter e hizo "referidos para Coaching para la Querellantes y su Supervisora, al igual que recomendaciones para mejorar su comunicación". Por último, solicitó que se declarara No Ha Lugar la Querella Enmendada.[6]

Tras varias incidencias procesales, Universal sometió una *Solicitud de Sentencia Sumaria*.[7] Expuso que la señora Butter no fue víctima de represalias como alegó. Sostuvo, además, que la prueba en el récord es insuficiente para poder determinar que la Recurrida no tenía otra opción que renunciar a su empleo. Entiende que esta renunció voluntariamente. Por consiguiente, solicitó que se declarara ha lugar la petición de sentencia sumaria y, en consecuencia, se desestimara con perjuicio ambas causas de acción.

Oportunamente, la señora Butter presentó su *Oposición a "Solicitud de Sentencia Sumaria"*, mediante la cual reafirmó su posición y expuso que existen hechos en controversia. Por ende, exigió que se declarara no ha lugar la moción de Universal.[8]

En respuesta, Universal sometió una *Réplica a Oposición a Solicitud de Sentencia Sumaria*, para reiterar su petición de desestimación de la causa en su contra.[9]

Por su parte, la Recurrida presentó una *Dúplica a Réplica a Oposición a Solicitud de Sentencia Sumaria*, para solicitar se declare no ha lugar la pretensión de Universal.[10]

---

[6] *Íd.*, págs. 72-98.
[7] *Íd.*, págs. 99-527.
[8] *Íd.*, págs. 528-978.
[9] *Íd.*, págs. 979-995.
[10] *Íd.*, págs. 996-1000.

Evaluados los planteamientos de las partes, el TPI determinó los siguientes hechos como incontrovertidos:

1. La querellante, Jackeline Butter Matos (Butter), trabajó para Universal Life Insurance Company, por aproximadamente diecisiete (17) años hasta su renuncia el 31 de mayo de 2022.

2. En todo momento, durante su empleo con Universal Life Insurance Company, Butter ocupó el puesto de Supervisora de Reclamaciones del Área de Vida.

3. Butter admitió que en Universal Life Insurance Company existen otras personas que ejercen roles de supervisión; que hay múltiples formas y estilos de supervisión; y que dar seguimiento a los subalternos es un componente normal del proceso de ejercer supervisión.

4. El 12 de junio de 2019 Butter comenzó a ser supervisada por la Lcda. Suzie Rivera Pacheco (Lcda. Rivera), Gerente del Departamento de Reclamaciones de Vida.

5. Por su parte, Butter estaba a cargo de la supervisión directa de las siguientes tres empleadas: Olga Sierra, Melitza Santiago y Sonia Rodríguez.

6. El 18 de diciembre de 2019 Butter acudió a Recursos Humanos y presentó una queja por alegado "trato hostil" de parte de la Lcda. Rivera.

7. En el párrafo 18 de su Querella, Butter alegó:

   El 20 de febrero de 2020, la Lcda. Rivera envió [un] correo electrónico llamándole la atención a la Sra. Butter porque supuestamente no la mantuvo al tanto sobre el envío de un cheque; todos los correos electrónicos con relación a esta reclamación siempre fueron copiados o dirigidos a la Lcda. Rivera. En esta fecha Sra. Butter así se lo hizo saber contestándole el correo electrónico. La Lcda. Rivera no contestó.

8. El 21 de enero de 2020, un mes antes del suceso alegado en el párrafo 18 de su Querella, y un mes después de su queja por "trato hostil", en Recursos Humanos, la Lcda. Rivera le envió un correo electrónico a Butter, en el cual, en respuesta a un borrador de carta que Butter había preparado, la Lcda. Rivera aseveró lo siguiente: "Esto está excelente, gracias".

9. El 12 de febrero de 2020, una semana antes del suceso alegado en el párrafo 18 de su Querella, y menos de dos meses después de su queja por "trato hostil", en Recursos Humanos, en respuesta a un plan propuesto por Butter, respecto a unos certificados de nacimiento, la Lcda. Rivera le envió un correo electrónico a Butter, en el cual aseveró lo siguiente: "Me parece bien. Vamos a implementar tu plan desde hoy. Gracias".

10. En el párrafo 20 de su Querella, Butter alegó:

El 2 de marzo de 2020, la analista Olga Sierra trae a la atención de la Sra. Butter que envió un correo electrónico al patrono "Collins" solicitándole cierta información y que le contestaron que esa información, valga la redundancia, ya había sido peticionada por la Sra. Melitza Santiago. La Lcda. Rivera sigue el patrón de impartirle instrucciones a las empleadas supervisadas por la Sra. Butter sin ninguna notificación a ésta. La Sra. Melitza Santiago confirmó haber recibido instrucciones directas de parte de la Lcda. Rivera. La Sra. Butter se siente degradada e ignorada con esta situación.

11. Respecto al párrafo 20 de su Querella, Butter admitió que, en términos de jerarquía, la Lcda. Rivera estaba por encima de las empleadas que Butter supervisaba, y que no había impedimento alguno que la Lcda. Rivera le dé instrucciones a dichas empleadas.

12. Respecto al párrafo 20 de su Querella, Butter admitió que, para que la Lcda. Rivera pudiera dar instrucciones a las empleadas que Butter supervisaba, no había un requisito de que Butter se enterara de que se impartieron tales instrucciones, ni de que Butter tuviese que estar presente al momento de darse las mismas.

13. En el párrafo 21 de su Querella, Butter alegó:

El 6 de marzo de 2020, la Sra. Butter se encontraba fuera del área de trabajo, cuando regresa, la Lcda. Rivera estaba dando instrucciones sobre las reclamaciones de SINOT del grupo HIMA San Pablo. La Licenciada no hizo partícipe de las instrucciones a la Sra. Butter, quien conoció cuáles eran éstas por otra empleada. Acto hostil y adverso a la querellante.

14. Respecto al párrafo 21 de su Querella, Butter admitió que ella no se encontraba en el área cuando se dieron las instrucciones; que sí supo de las mismas; y que las pudo utilizar, para efectos de su trabajo. También, admitió que este asunto no le afectó en su ejecutoria con las reclamaciones de SINOT ni con aspecto alguno.

15. En el párrafo 22 de su Querella, Butter alegó:

El 15 de marzo de 2020, la Sra. Butter se encontraba en el baño lavándose las manos, cuando entonces la Lcda. Rivera entró y le preguntó si había salido por el área de la hielera o por donde "se supone". La Sra. Butter se sintió tensa con esta situación.

16. Respecto al párrafo 22 de su Querella, Butter admitió que, en efecto, había una instrucción de la compañía, respecto al área por la cual la gente debía salir, y que lo que le preguntó la Lcda. Rivera a Butter fue si Butter había cumplido con dicha instrucción.

17. Respecto al párrafo 22 de su Querella, Butter admitió que no existe impedimento alguno a que un supervisor le pregunte a un subalterno si cumplió con una instrucción de la compañía.

18. Respecto al párrafo 22 de su Querella, Butter admitió que no recuerda cuál fue el tono de la Lcda. Rivera, al hacerle la pregunta.

19. En el párrafo 25 de su Querella, Butter alegó:

El 4 de mayo de 2020, la Sra. Butter se encontraba analizando reclamaciones nuevas del SINOT. La Sra. Olga Sierra le indica que por instrucciones de la Lcda. Rivera le entregara las reclamaciones nuevas que se encontraba analizando y que solamente analizaría las de seguimiento. La Sra. Butter nuevamente se sintió marginada, degradada y descalificada en sus funciones de supervisión. Nuevamente una empleada a la que supervisa le imparte instrucciones, además de ser discriminada en los términos y condiciones de su empleo.

20. Respecto al párrafo 25 de su Querella, Butter admitió que lo que ocurrió fue que la señora Olga Sierra le transmitió a Butter unas instrucciones que impartió la Lcda. Rivera. Butter, también, admitió que, siendo Butter una subalterna de la Lcda. Rivera, no hay impedimento alguno a que la Lcda. Rivera le imparta instrucciones a Butter, a través de otras personas.

21. En el párrafo 26 de su Querella, Butter alegó:

El 19 de junio de 2020, la Lcda. Rivera de forma arbitraria decide que las reclamaciones de beneficios por muerte de SINOT, pasarían a cargo de la Sra. Butter enteramente. Esta tarea la realizaba la Sra. Olga Sierra quien es analista. La Sra. Butter se sintió que se le degradó nuevamente en sus funciones como supervisora. En un continúo detonante adverso en su persona.

22. Respecto al párrafo 26 de su Querella, Butter admitió, y así también se desprende de dos correos electrónicos que envió la Lcda. Rivera, que lo que ocurrió fue que la Lcda. Rivera le asignó esto a Butter por la experiencia que ella tenía en este tipo de caso. La Lcda. Rivera, también, indicó que el plan estaba abierto a sugerencias y cambios que redunden en una administración de los asuntos más diligente y efectiva.

23. Respecto al párrafo 26 de su Querella, Butter admitió que, en efecto, ella tenía experiencia en este tipo de caso, tal como lo indicó la Lcda. Rivera, en su correo electrónico.

24. Respecto al párrafo 26 de su Querella, Butter admitió que la Lcda. Rivera, dentro de las prerrogativas que tenía, podía asignarle este asunto a Butter, máxime cuando era un asunto sobre el cual Butter tenía experiencia, tal como la Lcda. Rivera reconoció.

25. Respecto al párrafo 26 de su Querella, Butter admitió que no hay impedimento alguno a que una supervisora como la Lcda. Rivera modifique o redistribuya la manera en la que se hacen las funciones en el área.

26. En el párrafo 28 de su Querella, Butter alegó:

El 29 de junio de 2020, la Lcda. Rivera se acercó al escritorio de la Sra. Butter con la analista Olga Sierra, la supervisada de la Sra. Butter, para indicarle que, desde ese día, Butter, comenzaría un adiestramiento. La Lcda. Rivera le expresó a la Sra. Butter que sería la Sra. Sierra quien le brindaría dicho adiestramiento. Adujo que es la Sra. Sierra quien conoce como ella desea que se trabajen las reclamaciones. Por otro lado, se le informó a la Sra. Butter, que debía aprobar las reclamaciones subsiguientes con unas instrucciones específicas. También, la Sra. Butter, tenía que entrar todos los pagos de las reclamaciones de SINOT que apruebe, tarea que le correspondía a la Sra. Olga Sierra (analista). La Sra. Butter fue degradada nuevamente en sus funciones, acto continuo y progresivo.

27. Respecto al párrafo 28 de su Querella, Butter admitió que Olga Sierra estaba capacitada para dar el adiestramiento asignado por la Lcda. Rivera. También admitió nuevamente que no hay impedimento a que la Lcda. Rivera le comunique instrucciones a Butter, a través de otras personas.

28. En el párrafo 29 de su Querella, Butter alegó:

El 2 de julio de 2020, la Lcda. Rivera le envía un correo electrónico a la Sra. Butter indicándole que se trabajaron dos expedientes de incapacidad erróneamente. La Sra. Butter aclara la situación, mediante correo electrónico, el día 3 de julio de 2020. Nótese que esos casos quien los trabaja y es responsable de archivarlos es la Sra. Olga Sierra, a la Sra. Butter nunca se le consultó ni se llevó a su atención nada sobre ellos. Se repite el patrón de acusar a la Sra. Butter de asuntos que no le corresponden.

29. Respecto al párrafo 29 de su Querella, Butter admitió que no recuerda si fue amonestada por este asunto y que, si hubiera sido amonestada, lo recordaría.

30. En el párrafo 30 de su Querella, Butter alegó:

El 3 de julio de 2020, luego del correo electrónico aclaratorio, la Sra. Butter se dirige a la oficina de la Lcda. Rivera para entregarle la contestación del Departamento del Trabajo sobre los dos expedientes de incapacidad antes mencionados. La Lcda. Rivera de forma altiva, se echa hacia atrás en su silla y le dice con relación al correo electrónico: "explícame que es eso que tú me quieres decir, porque eso yo no lo tengo claro". La Sra. Butter

intenta explicarle sobre lo que se había contestado en el correo electrónico del 3 de julio de 2020, a lo que la Lcda. Rivera le pregunta, nuevamente de forma altiva: "¿qué tienen que ver los casos de coordinación de SINOT con el caso que desde el 2016 no se le dio seguimiento?". La Sra. Butter vuelve a intentar explicar, mientras la Lcda. Rivera va a su escritorio y luego de terminar de leer el correo electrónico, desde su escritorio, y sin excusarse, le dice: "ya entendí tu correo electrónico". Repite el acto de regañar primero y luego revisar e investigar.

31. Respecto al párrafo 30 de su Querella, Butter admitió que, cuando alega que la Lcda. Rivera se dirigió a ella "de forma altiva", se refiere a los "gestos corporales" de echarse hacia atrás en su silla y levantar las manos.

32. Respecto al párrafo 30 de su Querella, Butter admitió que los asuntos allí expuestos formaban parte del trabajo de supervisión que le correspondía a ella y que era parte de un proceso ya establecido en el departamento.

33. Respecto al párrafo 30 de su Querella, Butter admitió que lo allí expuesto era un asunto que tenía que ver con las funciones que se llevaban a cabo en el área en la cual ella trabajaba.

34. En el párrafo 32 de su Querella, Butter alegó:

El 10 de julio de 2020 la Lcda. Rivera le envió un correo electrónico a la Sra. Butter preguntándole por la gestión de un caso. La Sra. Butter procede a llevarle el expediente para intentar explicarle lo que había hablado con la reclamante telefónicamente sobre su caso en la Corporación del Fondo de Seguro del Estado. La Lcda. Rivera le manifiesta que esas no eran las instrucciones, que donde decía en el correo electrónico que la podía llamar. La Sra. Butter le contesta que en el correo electrónico si decía expresamente que le podía llamar. La contestación de la Lcda. Rivera fue: "aquí hay un problema de comprensión de lectura". La Sra. Butter se sintió humillada y maltratada con esta lamentable aseveración. Del correo electrónico se desprende la orden de la Lcda. Rivera que cumplió la Sra. Butter y que luego fue contradicha por quien la ordenó, valga la redundancia.

35. El asunto que Butter alega en el párrafo 32 de su Querella, supuestamente ocurrió el 10 de julio de 2020, o sea, casi siete (7) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

36. Respecto al párrafo 32 de su Querella, al preguntársele a Butter por qué interpreta como represalia un comentario que se le hizo tanto a ella como a otra subalterna, Butter respondió: "Porque se lo hizo en forma de broma, de acuerdo a lo que parece que es uso y costumbre de la licenciada Rivera".

37.  Respecto al párrafo 32 de su Querella, Butter admitió que la Lcda. Rivera no le gritó cuando le hizo el comentario de "problema de comprensión de lectura".

38.  Respecto al párrafo 32 de su Querella, Butter admitió que se trata de un correo electrónico, en el cual la Lcda. Rivera le está llamando la atención, por un asunto relacionado con las funciones de su empleo.

39.  En el párrafo 33 de su Querella, Butter alegó:

El 10 de julio de 2020, en la tarde, la Lcda. Rivera aborda a la Sra. Butter con dos reclamaciones de crédito. La Lcda. Rivera le pregunta a la Sra. Butter si sabía de lo que hablaba, a lo que la Sra. Butter contesta que sí. La Licenciada le responde que a pesar de llevar 15 o 30 años (la Sra. Butter) trabajando ese tipo de reclamación, lo estaba haciendo mal. Otra ocasión más en que la Lcda. Rivera descalifica el trabajo de la Sra. Butter incorrectamente. Estas acusaciones fueron verbales y posteriormente enviadas mediante correo electrónico. La Sra. Butter se siente confundida y más preocupada por estas imputaciones incorrectas.

40.  Respecto al párrafo 33 de su Querella, al preguntársele a Butter si su queja en este párrafo es que era falso lo que dijo la Lcda. Rivera o si su queja era por la manera en la que la Lcda. Rivera se lo dijo, respondió: "De la manera en que ella me lo dijo".

41.  Respecto al párrafo 33 de su Querella, Butter admitió que las personas, ya sean supervisores en un área de trabajo o personas en cualquier otro contexto, tienen diferentes formas de decir las cosas y diferentes tonos de hablar.

42.  Respecto al párrafo 33 de su Querella, Butter admitió que este era un asunto que tenía que ver con sus funciones de empleo, y que ella era quien aprobaba las reclamaciones de crédito para pago.

43.  En el párrafo 35 de su Querella, Butter alegó:

El 13 de julio de 2020, la Lcda. Rivera hizo juicio sobre la reclamación 200507- 0572-1723, e indicó que la Sra. Butter la denegó incorrectamente. Es importante mencionar que la reclamante en ese caso solicitó reconsideración y el Departamento del Trabajo confirmó la determinación de denegación emitida por la Sra. Butter. Otra ocasión en que se le acusa incorrectamente a la Sra. Butter por su trabajo.

44.  En cuanto a lo alegado en el párrafo 35 de la Querella, aunque en el caso 200507- 0572-1723, en efecto, hubo una determinación inicial, notificada el 16 de julio de 2020, mediante la cual se confirmó la denegación emitida por Butter, la realidad es que, posteriormente, el Secretario

del Trabajo emitió una Decisión, notificada el 17 de agosto de 2021, mediante la cual dejó esa determinación inicial sin efecto y declaró a la reclamante elegible a los beneficios de incapacidad temporal.

45.     Respecto al párrafo 35 de su Querella, Butter admitió que parte del rol de la Lcda. Rivera es pasar juicio del trabajo de ella.

46.     Respecto al párrafo 35 de su Querella, Butter admitió que, en estos casos, la decisión de Universal Life y del Departamento del Trabajo no siempre están a tono, porque a veces Universal Life recomienda denegar, pero el Departamento del Trabajo decide otra cosa.

47.     En los párrafos 36 y 37 de su Querella, Butter alegó:

El 16 de julio de 2020, la Sra. Butter le pasó el expediente HORI004246 corregido para aprobación, según un correo electrónico enviado el 8 de julio de 2020. En la tarde, la Lcda. Rivera devuelve el expediente diciendo que no había nada nuevo. El expediente tenía una nueva hoja con cálculos corregidos, según lo solicitado. El 17 de julio de 2020, la Sra. Butter nuevamente le pasa el expediente para aprobación a la Lcda. Rivera. El expediente tenía un papel grapado con un cómputo y una nota explicando por qué le había pasado el expediente el día anterior para aprobación. La Lcda. Rivera se dirige al escritorio de la Sra. Butter con el expediente y le indica de forma hostil que ella le puede poner todas las notas que ella quiera, pero que eso el día anterior no estaba. La Sra. Butter procede a explicarle y a mostrarle en el expediente la hoja anterior con el cómputo incorrecto, el cual estaba tachado, y la hoja nueva con el cómputo correcto. La Sra. Butter le pregunta a que se refiere cuando indica que eso el día anterior no estaba; la Lcda. Rivera, de forma humillante, le pregunta "¿no entiendes?", todo esto frente a los demás compañeros de trabajo. La Sra. Butter explica otra vez que el cálculo está correcto. La Lcda. Rivera le dice "olvídalo" y se va molesta. La Sra. Butter expresa no entender, porque le estaba explicando que el cálculo estaba correcto y eso no le era suficiente; también le comenta que hacen falta todavía el ponche y sus iniciales. La Lcda. Rivera regresó, lo ponchó y lo inició.

48.     Respecto a los párrafos 36 y 37 de su Querella, Butter declaró que su queja, sobre este asunto, es la "manera" en la cual la Lcda. Rivera le habló, específicamente, que la Lcda. Rivera fue "eufórica" y no fue "pasiva o cordial" o "con respeto".

49.     Respecto a la alegación de Butter de que la Lcda. Rivera no se dirigió a ella "con respeto", Butter admitió que no incluyó esa alegación en los párrafos 36 y 37 de su Querella, y que hubiera sido importante incluirla. También, admitió que, cuando dice que la Lcda. Rivera no se dirigió a

ella "con respeto", se refiere a que la Lcda. Rivera le preguntó: "¿no entiendes?".

50.     El 20 de julio de 2020, Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones".

51.     Al preguntársele a Butter a qué se refería su queja de "discrimen", respondió que era "por edad". No obstante, admitió que no tiene prueba alguna de que ni su patrono ni la Lcda. Rivera la hayan discriminado a ella por razón de su edad, ni tampoco lo está reclamando en el presente caso.

52.     En el párrafo 41 de su Querella, Butter alegó:

El 25 de agosto de 2020, nuevamente por correo electrónico se le quiere atribuir errores, deficiencias y responsabilidades a la Sra. Butter que no le correspondían. La Sra. Butter vuelve por la vía electrónica a defenderse de los hechos falsamente atribuidos a su persona.

53.     En cuanto a lo alegado en el párrafo 41 de la Querella, el martes, 25 de agosto de 2020, la Lcda. Rivera le envió a Butter un correo electrónico, respecto a un caso, en el cual habían dos designaciones de beneficiarios con la misma fecha. En el mismo, la Lcda. Rivera indicó que lo que había discutido y acordado con Butter era que, a menos que todos los herederos del fenecido consintieran a que el beneficio se divida en partes iguales entre ellos, era necesario solicitar la declaratoria de herederos para consignar el beneficio. Siendo ello así, la Lcda. Rivera expuso que, cuando recibió el caso para aprobación y vio que la hoja de pago distribuyó el beneficio en partes iguales, infirió que todos los herederos habían consentido. No obstante, posteriormente recibió una llamada de una representante legal del caso, quien le informó que no había mediado tal consentimiento.

54.     Tres días más tarde, el viernes, 28 de agosto de 2020, Butter contestó al correo electrónico de la Lcda. Rivera, y alegó, entre otras cosas, que la Lcda. Rivera no le había dado la instrucción sobre el asunto de que todos los herederos consintieran. Butter, también, indicó en ese correo electrónico que, si la Lcda. Rivera hubiese "verific[ado] detenidamente" el expediente, se debió haber percatado de que no había evidencia de consentimiento.

55.     El lunes, 31 de agosto de 2020, la Lcda. Rivera replicó al correo electrónico de Butter, indicando lo siguiente: "Leído los planteamientos, me reitero en lo aseverado en mi correo anterior".

56.     En los párrafos 42 y 43 de su Querella, Butter alegó:

El 8 de septiembre de 2020, la Lcda. Rivera por correo electrónico le imputa falsamente a la Sra. Butter tener un patrón de ausencias y tardanzas antes de la llegada de la Pandemia. La Sra. Butter contesta el correo electrónico

indicándole que eso es falso. El 9 de septiembre 2020, la Lcda. Rivera por correo electrónico acusa falsamente a la Sra. Butter de una habitual falta de puntualidad y de notificación sobre ello. También peticiona "un cese y desista de conducta hostil y peyorativa"[.]

57. Respecto a los párrafos 42 y 43 de la Querella, Butter admitió que ella sí había tenido tardanzas antes de la pandemia.

58. Respecto a los párrafos 42 y 43 de la Querella, Butter admitió que todo lo allí alegado tiene que ver con sus funciones de trabajo.

59. En el párrafo 54 de su Querella, Butter alegó:

El 19 de octubre de 2020, la Sra. Butter recibió un correo electrónico de la empleada Melitza Santiago, informando que no llegaría a su turno de trabajo. La Sra. Butter le escribió: "Gracias por informar", copiando a la Srta. Rivera. La Sra. Santiago, quien aún es supervisada por la Sra. Butter, se ausentó también el día siguiente. En esta ocasión no se comunicó con su supervisora. Resultó ser que la Sra. Santiago se encontraba trabajando remoto y no se le notificó a la Sra. Butter, quien se siente continuamente ignorada por la empresa.

60. Respecto al párrafo 54 de su Querella, Butter admitió que aquí se trata de dos días en que se ausentó la señora Santiago: el primer día, la señora Santiago le notificó la ausencia a Butter, y el segundo día, Butter se enteró por otras empleadas que la señora Santiago estaba trabajando remoto.

61. Respecto al párrafo 54 de su Querella, Butter admitió que desconoce si alguien en Universal le dio instrucciones a la señora Santiago de no informarle a Butter que iba a trabajar remoto ese segundo día.

62. Respecto al párrafo 54 de su Querella, Butter admitió que, como la señora Santiago era una subalterna de la Lcda. Rivera, la Lcda. Rivera, tenía la discreción de autorizar a la señora Santiago a trabajar remoto. También, admitió que desconoce si hay disposición o regla alguna en Universal Life que requería que, en una circunstancia como ésta, a Butter se le informe sobre el particular.

63. En el párrafo 55 de su Querella, Butter alegó:

El 23 de octubre de 2020, la Sra. Butter se encontraba en su escritorio, cuando la Lcda. Rivera le dice: "permiso Jackeline, llamó el agente del caso de Ismael Colón, le mencionaste que yo tenía el expediente, ese expediente tú lo tienes, porque esta ante tu consideración para análisis". La Sra. Butter trató de explicarle, pero no se le permitió expresarse. La Lcda. Rivera, falsamente adujo que le había dado unas instrucciones por correo electrónico.

La Sra. Butter intentó comunicarse nuevamente, pero la Lcda. Rivera dijo: "no voy a entrar en controversias, buenas tardes" y se marchó. La Sra. Butter comenzó a llorar ya que se sentía muy ansiosa y deprimida.

64.    Respecto al párrafo 55 de su Querella, Butter declaró que se trata de una situación en que Butter le iba a dar una explicación a la Lcda. Rivera, pero la Lcda. Rivera supuestamente le dijo "No voy a entrar en controversias, buenas tardes", lo cual Butter interpretó como que no podía decir más nada. Ante este testimonio, se le preguntó a Butter si, al igual que hizo en varias otras ocasiones, no se comunicó con la Lcda. Rivera por correo electrónico para proveerle la explicación. Butter admitió que no lo hizo.

65.    Respecto al párrafo 55 de su Querella, Butter admitió que se trata de un asunto que tenía que ver con sus funciones de empleo.

66.    En el párrafo 56 de su Querella, Butter alegó:

El 23 de octubre de 2020, la Sra. Butter recibió de parte del Sr. Jorge Montañez un correo electrónico dirigido a ella y a la Lcda. Rivera. En dicho correo electrónico se estaba solicitando la muestra para una auditoría. La Sra. Butter era quien por costumbre solicitaba los expedientes y enviaba la información para los auditores. La Sra. Butter, puso los expedientes encima de su escritorio con la lista que le envió el auditor. Casualmente, se le acerca la empleada Sonia Rodríguez y ve los expedientes con el listado, por lo que le comenta: "yo también tengo un listado así para buscar expedientes". Por otra parte, resulto ser, que la empleada Olga Sierra también tenía un listado parecido. La Sra. Sierra llevó esto a la atención de la Lcda. Rivera, quien entonces le envió un correo electrónico a la Sra. Butter quitándole dicha tarea. La Sra. Butter nuevamente se siente excluida de los procesos del área.

67.    Respecto al párrafo 56 de su Querella, Butter admitió que la función que supuestamente se le quitó no formaba parte de su Job Description o descripción de puesto.

68.    Respecto al párrafo 56 de su Querella, Butter admitió que desconoce a quién supuestamente se le dio la función que ella alega se le quitó.

69.    En el párrafo 58 de su Querella, Butter alegó:

El 26 de octubre de 2020, la Sra. Butter observó que todas las empleadas tenían un "headset" para comunicarse en una reunión por la aplicación "Teams". La Sra. Melitza Santiago y la Sra. Sonia Rodríguez, le comunicaron que tales herramientas fueron pedidas mientras la Sra. Butter se encontraba fuera del trabajo. La Lcda. Rivera no la incluyó en la solicitud de dicho material. La Sra. Butter procedió a comprar su propio "headset" para poder comunicarse en las

reuniones y con el personal que se encuentra trabajando remoto. Es evidente que se ha pretendido excluir totalmente a la Sra. Butter de los quehaceres del trabajo.

70.     Respecto al párrafo 58 de su Querella, Butter admitió que, al momento en que se le dieron los headsets a las otras empleadas, Butter se encontraba fuera de la oficina por enfermedad.

71.     Respecto al párrafo 58 de su Querella, Butter admitió que ella nunca le solicitó un headset a la Lcda. Rivera ni se quejó sobre el asunto, y que ella fue y se compró uno para ella.

72.     En el párrafo 60 de su Querella, Butter alegó:

El 2 de noviembre de 2020, luego de que la Sra. Butter organizó su agenda de trabajo remoto, recibió la visita en su escritorio de la Lcda. Rivera. La Licenciada en voz alta, con rudeza y frente a todas las empleadas iba descartándole expediente a expediente, haciendo manifestaciones como: "este caso no" o "llévate trabajo con sustancia". La manera en que se expresó la Lcda. Rivera y el tono en el que lo hizo, produjo que la Sra. Butter se sintiera menospreciada y ansiosa. La carga de trabajo de la Sra. Butter excedía su horario de trabajo regular.

73.     Respecto al párrafo 60 de su Querella, Butter admitió que, aunque no lo alegó en la Querella, aquí se trata de un "listado" de labores que comenzó a hacerse a partir de la pandemia.

74.     Respecto al párrafo 60 de su Querella, Butter declaró que lo que ocurrió fue que la Lcda. Rivera le habló "en voz alta" frente a otras empleadas, y a decirle cuáles casos debía llevarse y cuáles no. Sobre esto, Butter admitió que la Lcda. Rivera tenía discreción para asignarle a las empleadas que estaban bajo su supervisión el trabajo que se iban a llevar.

75.     Respecto al párrafo 60 de su Querella, Butter admitió que se trata de una situación en la cual la Lcda. Rivera le estaba llamando la atención por un asunto relacionado con las funciones de su empleo.

76.     En el párrafo 61 de su Querella, Butter alegó:

El 9 de noviembre de 2020, la Sra. Butter se encontraba atendiendo la llamada de una asegurada y la coloca en espera, "hold", para buscar una información en el sistema. En ese lapso entra una llamada del esposo de la Sra. Butter y procede a atenderla. Luego de terminar de atender la llamada con la asegurada, la Lcda. Rivera, desde su escritorio, de forma autoritaria, frente a todas las empleadas y en voz alta, dice: "No se puede dejar asegurados esperando para atender llamadas personales". La Sra. Butter se viró y le dijo que era su esposo, a lo que la Lcda. Rivera se repitió en el mismo

tono. La Sra. Butter, mientras el lugar de trabajo estaba en silencio, le repitió que era su esposo y comenzó a llorar.

77. Respecto al párrafo 61 de su Querella, Butter admitió que lo que ocurrió aquí no fue meramente que ella atendió una llamada personal, sino que puso en "hold" (en espera) a un cliente para contestar una llamada de su esposo.

78. Respecto al párrafo 61 de su Querella, Butter declaró que su queja es que se le dijo "en voz alta" que no podía atender una llamada personal. Admitió que este asunto tiene que ver con sus funciones de empleo.

79. Respecto al párrafo 61 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

80. En el párrafo 63 de su Querella, Butter alegó:

El 12 de noviembre de 2020, durante la mañana, mientras la Sra. Butter atendía una llamada telefónica, la Lcda. Rivera hablaba con las empleadas sobre el cierre parcial. Como es acostumbrado la Lcda. Rivera no hizo partícipe a la Sra. Butter. La Sra. Butter tuvo que preguntarle a la empleada Sonia Rodríguez cuál era el estado de situación. Véase que la Lcda. Rivera no le dirige la palabra a la Sra. Butter, a menos que no sea para la humillación y el desprecio en sus funciones. La comunicación se restringe a los correos electrónicos que por lo general también son en desprecio y humillación.

81. El asunto que Butter alega en el párrafo 63 de su Querella, supuestamente ocurrió el 12 de noviembre de 2020, o sea, casi cuatro (4) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

82. Respecto al párrafo 63 de su Querella, Butter admitió que, cuando se estaban dando estas instrucciones, ella estaba atendiendo una llamada y que, como cuestión de hecho, Butter se enteró de las instrucciones a través de otra empleada, por lo que ni sufrió perjuicio alguno ni tuvo problemas en cumplir con las instrucciones impartidas.

83. Respecto al párrafo 63 de su Querella, Butter declaró que no recuerda si este asunto le afectó en términos de cumplir con el cierre parcial, ni tampoco si le afectó en algún aspecto de su empleo.

84. En el párrafo 64 de su Querella, Butter alegó:

El 12 de noviembre de 2020, cuando la Sra. Butter fue a darle los expedientes de trabajo remoto a la Lcda. Rivera, ésta los tomó de forma brusca. Luego de revisar dichos expedientes, los dejó en el escritorio de la Sra. Butter de forma desordenada. Esta es la costumbre de la Lcda. Rivera cuando deja expedientes en el escritorio

de la Sra. Butter. Posteriormente, la Lcda. Rivera fue al escritorio de la empleada Melitza Santiago para tomar unos expedientes que terminó dejando en el escritorio de la Sra. Butter. La Lcda. Rivera le indicó: "llévate esto y si tienes dudas pregúntale a Melitza". Todo esto sucedió nuevamente frente a todas las empleadas. La Sra. Santiago le explicó el contenido del trabajo y se ofreció a trabajarlos luego. La Sra. Butter le manifestó que no porque podía buscarse un problema. Entonces realizó la encomienda que le produjo trabajo en exceso de su jornada.

85. Respecto a la primera oración del párrafo 64 de su Querella, Butter declaró que se refiere a que la Lcda. Rivera agarró los expedientes "con rudeza".

86. Respecto a la alegación en el párrafo 64 de su Querella de que la Lcda. Rivera le dejó un expediente "desordenado", Butter admitió que la Lcda. Rivera no tiene obligación alguna de organizarle a Butter los documentos ni de colocárselos en su mesa de una manera particular. Butter, también, admitió que no tuvo problema alguno en trabajar con estos documentos.

87. Respecto al párrafo 64 de su Querella, Butter admitió que no hay impedimento alguno a que la Lcda. Rivera le diga a Butter que, si tiene cualquier duda sobre algún asunto, lo consulte con la señora Melitza Santiago.

88. Respecto al párrafo 64 de su Querella, Butter admitió que el asunto allí expuesto tenía que ver con las funciones que se llevaban a cabo en el área en la cual ella trabajaba.

89. En el párrafo 65 de su Querella, Butter alegó:

El 13 de noviembre de 2020, la Sra. Butter fue a la fotocopiadora de su empleo. A su regreso, la Lcda. Rivera e[s]taba parada frente al anaquel donde la Sra. Butter guarda sus expedientes de trabajo. En ese momento, la Lcda. Rivera le estaba preguntando a la empleada Sonia Rodríguez donde estaban los casos nuevos de la Sra. Butter. Luego de que la Sra. Rodríguez no supiera contestarle, le preguntó a la Sra. Butter donde estaban sus casos nuevos. La Sra. Butter le entregó sus expedientes, sintiéndose perseguida e intimidada. No se le explicó razón para llevarse su tarea.

90. Respecto al párrafo 65 de su Querella, Butter admitió que la Lcda. Rivera le hizo la pregunta a Sonia Rodríguez, porque, en ese momento, quien estaba ahí era Sonia Rodríguez, y no fue hasta después de hecha la pregunta que Butter llegó. También, admitió que, al llegar Butter, entonces la Lcda. Rivera le hizo la pregunta directamente a ella. También, admitió que no hay problema alguno con nada de lo anterior, ni con que la Lcda. Rivera solicite ver sus expedientes.

91.     En el párrafo 66 de su Querella, Butter alegó:

El 2 de diciembre de 2020, la Sra. Butter se encontraba hablando por teléfono con el empleado Víctor Pérez, quien le solicitó a la Sra. Butter que le comunicara con la Lcda. Rivera. La Sra. Butter se dirige al escritorio de la Lcda. Rivera para comunicarle sobre la llamada, la Lcda. Rivera se encontraba discutiendo asuntos del cierre parcial y el trabajo remoto. La Sra Butter, le dice: "Permiso, le pase una llamada de Víctor Pérez" y le dejó un expediente en sus manos. La llamada fue devuelta al escritorio de la Sra. Butter, quien terminó indicándole al Sr. Pérez que se le regresaría la llamada luego. Dos hechos llaman la atención, a la Sra. Butter otra vez más se le ignora en su trabajo y se entera de asuntos importantes de forma indirecta.

92.     Respecto a la alegación en el párrafo 66 de la Querella de que una llamada que Butter le pasó a la Lcda. Rivera regresó al teléfono de Butter, Butter admitió que, en ese momento, la Lcda. Rivera estaba discutiendo asuntos del cierre parcial, y que, cuando una llamada se le pasa a alguien y la persona no la contesta, la llamada regresa a quien intentó pasarla.

93.     En el párrafo 67 de su Querella, Butter alegó:

El 2 de diciembre de 2020, la Sra. Butter recibe un correo electrónico del Departamento del Trabajo para participar en una audiencia. La Lcda. Rivera contesta ese correo indicando que será ella quien participará en dicha audiencia. Nótese que nuevamente se le quitan facultades a la Sra. Butter sin ninguna comunicación directa al respecto.

94.     Respecto al párrafo 67 de su Querella, Butter admitió que la Lcda. Rivera comenzó a ir a unas [vistas] en calidad de oyente para familiarizarse con el proceso, lo cual era importante, porque se trataba del área que manejaba la Lcda. Rivera, y que, además, a las vistas a veces iba la Lcda. Rivera y a veces iba Butter.

95.     En el párrafo 68 de su Querella, Butter alegó:

El 16 de diciembre de 2020, la Lcda. Rivera le envía un correo electrónico a la Sra. Butter solicitándole que para la semana próxima desarrolle unos manuales para las diferentes líneas de reclamaciones. Carga obviamente excesiva que la Lcda. Rivera sabe que no se puede cumplir por el limitado tiempo que la Sra. Butter tiene en la oficina. Esto coloca a la Sra. Butter en una posición vulnerable, quien termina realizando dichas tareas desde su hogar fuera de horas laborables. La Sra. Butter se siente agobiada.

96.     Contrario a lo que Butter alega en el párrafo 68 de su Querella, en el correo electrónico del 16 de diciembre de 2020, la Lcda. Rivera no le dijo a Butter que tenía hasta la semana próxima para

desarrollar los manuales. Lo que la Lcda. Rivera le dijo fue que "[l]a preparación de estos manuales debe comenzar la semana que viene".

97.   En el correo electrónico del 16 de diciembre de 2020, la Lcda. Rivera le indicó a Butter que le estaba asignando el desarrollo de estos manuales "[e]n virtud de tu conocimiento en las funcionalidades del sistema".

98.   Respecto al párrafo 68 de su Querella, Butter admitió que ella conocía bien los sistemas relacionados con los "manuales" a los que allí se alude. También, admitió que ella era una persona idónea para trabajar con ese asunto.

99.   En el párrafo 69 de su Querella, Butter alegó:

El 17 de diciembre de 2020, la Sra. Butter le comentó a la empleada Olga Sierra que en el cierre parcial no pudo trabajar remoto y que será la empleada Sonia Rodríguez la única que trabajará remoto en el cierre parcial. La Sra. Sierra le indicó que la Lcda. Rivera ha sido flexible con otras empleadas en cuanto a la manera de trabajar. Vemos como la Lcda. Rivera tiene una deferencia con las demás empleadas que no es igual con la Sra. Butter. La Sra. Butter le comentó a la Sra. Olga Sierra que el 18 de diciembre de 2020 estaría sola en el área de trabajo, a lo que la empleada Olga Sierra dice: "debes anotar todo el trabajo que hagas, porque tú sabes cómo es ella contigo". Las empleadas de Universal reconocen el trato particular de la Lcda. Rivera con la Sra. Butter.

100.   En el párrafo 70 de su Querella, Butter alegó:

El 23 de diciembre de 2020, la Lcda. Rivera le dice a la empleada Olga Sierra que para la semana próxima, durante su ausencia, le dio instrucciones a "Carlitos" de Recursos Humanos, para que se comunicara con la Sra. Sierra para dar la orden de almuerzo en el área de trabajo. Otra ocasión que se ignora la presencia de la Sra. Butter como supervisora en el área de trabajo.

101.   Respecto al párrafo 70 de su Querella, Butter admitió que pedir almuerzos no era parte de sus funciones ni formaba parte de su descripción de puesto. También, admitió que no había impedimento alguno a que esta función se le delegue a Olga Sierra o a cualquier otra persona.

102.   En el párrafo 71 de su Querella, Butter alegó:

El 11 de enero de 2021, la empleada Olga Sierra le pasa a la Sra. Butter dos grupos de expedientes. La Sra. Sierra le indicó que la Lcda. Rivera decidió referirle nuevamente todos los expedientes porque tiene mucho trabajo. Obsérvese que esto es una aceptación tácita de que a la Sra. Butter se le había relegado en sus funciones. Paradójicamente, la degradación continúa porque recibe esta información de parte

de una de sus supervisadas. La Sra. Butter siente que ha perdido su puesto de supervisora.

103. Respecto al párrafo 71 de su Querella, Butter admitió que las funciones que se le dieron son funciones que ella ya hacía anteriormente, y que lo que ocurrió fue que le devolvieron dichas funciones. También, admitió nuevamente que no hay ningún impedimento a que ella reciba instrucciones que estén siendo impartidas por la Lcda. Rivera a través de otra persona.

104. En el párrafo 73 de su Querella, Butter alegó:

El 1 de febrero de 2021, la Sra. Butter se dirige a la Lcda. Rivera para hacerle entrega de unos expedientes. La Lcda. Rivera solo hace seña con el dedo. La Sra. Butter se restringió a dejar los expedientes donde se señalaba. Posteriormente, mientras la Sra. Butter trabajaba en su escritorio, la Lcda. Rivera se dirige donde ella y tira los expedientes sobre otros que se encontraban allí en su escritorio. La Sra. Butter se siente angustiada y temerosa por tal actitud.

105. Respecto al párrafo 73 de su Querella y la entrega de los expedientes, Butter declaró que su queja es que la Lcda. Rivera señaló con el dedo hacia la mesa, para indicarle a Butter que los coloque en la mesa, en vez de decirle verbalmente "Pues, ponlos aquí" o tomarlos en sus manos. No obstante, Butter admitió que ella estaba clara en cuanto a que la seña que le hizo la Lcda. Rivera significaba que debía colocar los expedientes en la mesa.

106. Respecto al párrafo 73 de su Querella y la alegación de que la Lcda. Rivera "tir[ó] los expedientes" cuando los devolvió, Butter admitió nuevamente que la Lcda. Rivera no tiene obligación alguna de entregar documentos en una manera particular.

107. Respecto al párrafo 73 de su Querella, Butter admitió que lo allí expuesto tiene que ver con sus funciones de empleo.

108. En el párrafo 74 de su Querella, Butter alegó:

El 2 de febrero de 2021, solo se encontraban en la oficina la empleada Olga Sierra y la Sra. Butter. Llega la Lcda. Rivera y dice: "Olga, buenos días". La Sra. Butter nuevamente es ignorada en lugar de trabajo. Siente que no existe para la Gerente de su área de trabajo.

109. El asunto que Butter alega en el párrafo 74 de su Querella supuestamente ocurrió el 2 de febrero de 2021, o sea, más de seis (6) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

110. Respecto al párrafo 74 de su Querella, Butter admitió que esta alegación está basada en su opinión de que un supervisor o supervisora debe

decirle "Buenos días" a todas las personas en su área de trabajo.

111.    Respecto al párrafo 74 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

112.    En el párrafo 76 de su Querella, Butter alegó:

El 9 de febrero de 2021, la Sra. Butter tenía expedientes que entregarle a la Lcda. Rivera para aprobación. La Sra. Butter no quería entregar dichos expedientes al día siguiente porque tenían fecha de ese día. Antes de que la Sra. Butter se retirase de su área de trabajo, le dejó los expedientes a la Lcda. Rivera en su escritorio. Al día siguiente, los expedientes se encontraban regados en el escritorio de la Sra. Butter, quien siente que se le falta el respeto.

113.    Respecto al párrafo 76 de su Querella, Butter admitió que aquí ella no le está imputando actuación alguna a la Lcda. Rivera, sino que está expresando que sentía temor. En cuanto a la última oración, admitió que desconoce quién le dejó los expedientes en su escritorio.

114.    Respecto al párrafo 76 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

115.    En el párrafo 77 de su Querella, Butter alegó:

El 12 de febrero de 2021, la Lcda. Rivera le delega a la Sra. Butter el monitoreo de los emails recibidos en "Claimslife". La Sra. Butter siente mucha carga de trabajo, sabiendo que existen otras empleadas de la oficina que tienen menos carga y les compete dicha función.

116.    Respecto al párrafo 77 de su Querella, Butter admitió nuevamente que una supervisora como la Lcda. Rivera tiene la discreción de redistribuir funciones o de cambiar una función que tenga una persona y dársela a otra persona.

117.    Respecto al párrafo 77 de su Querella, Butter admitió que se trata de un asunto que tenía que ver con sus funciones de empleo.

118.    En los párrafos 78-79 de su Querella, Butter alegó:

El 22 de febrero de 2021, la Sra. Butter fue a entregarle otros expedientes para aprobación. La Lcda. Rivera dejó a la Sra. Butter con la mano extendida y le dijo: "ponlos ahí". La Sra. Butter cada vez que se dirige a la Oficina de su supervisora se siente maltratada y menospreciada. El visitarla es un estresor por el miedo a cómo reaccionará. El 5 de marzo de 2021, la Sra. Butter otra vez se dirige a la oficina de la Lcda. Rivera para entregarle expedientes para aprobación. Nuevamente la Sra. Butter es dejada con la mano estirada. La Sra. Butter se siente menospreciada e ignorada.

119.    Respecto a los párrafos 78 y 79 de su Querella, Butter declaró que su queja responde a que la Lcda. Rivera le dijo "ponlos ahí" y que hizo "gestos corporales" consistentes en apuntar con su cabeza hacia la dirección en la que había que colocar los expedientes y, según Butter, "era en señal de desprecio".

120.    Respecto a los párrafos 78 y 79 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

121.    En el párrafo 80 de su Querella, Butter alegó:

El 10 de marzo de 2021, la Lcda. Rivera se dirige a la Sra. Butter preguntándole por qué no le había contestado un correo electrónico enviado a las 9:00 am. La Sra. Butter le explica que estaba procesando ciertos pagos de SINOT, a lo que la Lcda. Rivera, en tono hostil, contesta: "sí, pero te envíe un email". La Sra. Butter le pregunta si es prioritario y la Licenciada responde: "el email, contéstalo". La Sra. Butter nerviosa contestó el correo electrónico. Luego en esa tarde se repitió el procedimiento de la Sra. Butter entregando con temor expedientes para aprobación.

122.    Respecto al párrafo 80 de la Querella, Butter admitió que, en el trabajo que se hace en esta área, a veces surgen asuntos urgentes y/o asuntos con fechas límites o "deadlines" que, por su inminencia, tienen que ser atendidos. También, admitió que este párrafo versa sobre su percepción del alegado "trato hostil" de la Lcda. Rivera.

123.    Respecto al párrafo 80 de la Querella, Butter admitió que no existe impedimento alguno a que la Lcda. Rivera le exija a Butter una contestación a un correo electrónico que la Lcda. Rivera consideraba urgente.

124.    Respecto al párrafo 80 de su Querella, Butter admitió se trata de un asunto que tenía que ver con sus funciones de empleo.

125.    En el párrafo 81 de su Querella, Butter alegó:

El 16 de marzo de 2021, la Lcda. Rivera se acerca al escritorio de la Sra. Butter para entregarle un expediente. En dicho proceso se inclina y le dice con tono sarcástico a la Sra. Butter: "a la mano". Ese expediente la Sra. Butter se lo había hecho llegar a la Lcda. Rivera por medio de la empleada Sonia Rodríguez. La Sra. Butter se sintió atacada.

126.    El asunto que Butter alega en el párrafo 81 de su Querella supuestamente ocurrió el 16 de marzo de 2021, o sea, casi ocho (8) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones" el 20 de julio de 2020.

127.    Respecto al párrafo 81 de su Querella, Butter declaró que su queja aquí es por el "tono" que

ella percibió como "sarcástico" cuando la Lcda. Rivera dijo "a la mano".

128.    Respecto al párrafo 81 de su Querella, Butter admitió que se trata de un asunto que tenía que ver con sus funciones de empleo.

129.    Respecto al párrafo 81 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

130.    En el párrafo 82 de su Querella, Butter alegó:

El 31 de marzo de 2021, la Sra. Butter fue a entregarle unos expedientes a la Lcda. Rivera, quien se encontraba charlando con la empleada Melitza Santiago. Nótese que con la Sra. Butter no hay diálogo de ningún tipo a menos que se trate de un regaño; a diferencia de lo que sucede con otras empleadas. La Lcda. Rivera, mientras la Sra. Butter intentaba entregarle los expedientes, le dice: "no me los dejes, llévatelos y revísalos bien". La Sra. Butter le contesta que ya fueron revisados, a lo que la Lcda. Rivera le responde: "pues revísalos otra vez y no me discutas, no me faltes el respeto, estas desobedeciendo mis órdenes". Obviamente esta es una situación totalmente creada por la Lcda. Rivera que produjo que la Psicóloga Vivian Acevedo le recomendara a la Sra. Butter la semana del 5 – 9 de abril de descanso.

131.    El asunto que Butter alega en el párrafo 82 de su Querella supuestamente ocurrió el 31 de marzo de 2021, o sea, más de ocho (8) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones" el 20 de julio de 2020.

132.    Respecto al párrafo 82 de su Querella, Butter admitió que desconoce por qué razón la Lcda. Rivera le entregó los expedientes nuevamente para que los revisara.

133.    Respecto al párrafo 82 de su Querella, Butter admitió que podían haber habido errores en expedientes anteriores, y también admitió que una de las funciones que tiene una persona en la posición de la Lcda. Rivera es asegurarse de que los expedientes se revisen bien y no haya ese tipo de error en el proceso de revisión.

134.    Respecto al párrafo 82 de su Querella, Butter admitió se trata de un asunto que tenía que ver con sus funciones de empleo.

135.    En el párrafo 85 de su Querella, Butter alegó:

El 30 de abril de 2021, la Lcda. Rivera realizó una reunión de SINOT con la empleada Melitza Santiago y Alan Márquez. Nuevamente la Sra. Butter fue excluida, tan siquiera se le informó de lo sostenido en la reunión. Fue la Sra. Santiago quien posteriormente le expresó lo discutido. Otro incidente donde la Sra. Butter

se siente degradada, menospreciada e ignorada en sus funciones.

136.     Respecto al párrafo 85 de su Querella, Butter admitió nuevamente que se enteró del asunto posterior a la reunión; que no hay impedimento alguno a que ella se entere de asuntos de esa manera; y que, como consecuencia de desconocer lo que se haya discutido en esa ocasión, ella no cometió error alguno, ni hizo nada mal, ni se le amonestó.

137.     En el párrafo 86 de su Querella, Butter alegó:

El 4 de mayo de 2021, la Lcda. Rivera vuelve a tirarle los expedientes a la Sra. Butter en su escritorio. El temor de la Sra. Butter cada vez es mayor.

138.     Respecto al párrafo 86 de su Querella, Butter declaró que la Lcda. Rivera se acercó a la mesa de Butter y soltó los expedientes a una altura aproximadamente equivalente a la altura de un vaso de agua; que los expedientes hicieron un ruido cuando cayeron en la mesa; y que sintió "temor".

139.     En el párrafo 90 de su Querella, Butter alegó:

El 20 de mayo de 2021, la Lcda. Rivera le pregunta por correo electrónico a la Sra. Butter si la licencia solicitada para el 28 de mayo se cargaría a enfermedad o vacaciones. La Sra. Butter le responde "family sick" y adjunta un "screenshot" de la solicitud inicialmente presentada. Ante esto, la Lcda. Rivera le contesta a la Sra. Butter: "para futura ocasiones, puedes indicarme la licencia sin pasar la complicación del screenshot". La Sra. Butter le indica que para ella no es una complicación, pero que lo tomará en consideración. Concluye la Licenciada diciendo: "creo que ha mediado una confusión, lo solicitado no queda a tu futura consideración sino a cumplimiento". Nótese que el uso de la palabra "puedes" por parte de la Lcda. Rivera dejaba entrever que el comentario no era un mandato sino un asunto discrecional. La Lcda. Rivera continúa con el patrón de regaños superfluos que solo abonan al ambiente hostil.

140.     Respecto al párrafo 90 de su Querella, Butter admitió que lo que ocurrió fue que la Lcda. Rivera le estaba diciendo a Butter que no utilizara tiempo de sus labores para hacer un screenshot y que, en futuras ocasiones, era suficiente con que solamente le informara que era family sick. Butter también admitió que no había impedimento alguno a que la Lcda. Rivera le diera tal instrucción.

141.     Respecto al párrafo 90 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

142.     En el párrafo 94 de su Querella, Butter alegó:

El 7 de julio de 2021, la Lcda. Rivera compartía con las otras empleadas su opinión sobre los acomodos razonables, diciendo: "los empleados se creen que luego de solicitar un acomodo razonable la compañía está obligado a dárselo, para eso hay unas leyes. Los empleados también creen que se van a ir con el mismo sueldo, no, le bajan el sueldo a lo que pague la plaza". Subsiguientemente, también manifestó: "alegan represalias para que le den un acomodo y se tienen que quedar en el área aguantando". Estas expresiones resultan lamentables y fuera de lugar. La Lcda. Rivera abiertamente compartió el caso de la Sra. Butter, atacando su dignidad y aumentando el ambiente hostil.

143. Respecto al párrafo 94 de su Querella, Butter admitió que no tiene base alguna para concluir que, en los comentarios a los que se alude en dicho párrafo, la Lcda. Rivera estaba refiriéndose a Butter ni a empleado alguno de Universal Life.

144. Respecto al párrafo 94 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

145. En el párrafo 95 de su Querella, Butter alegó:

El 8 de julio de 2021, la Lcda. Rivera le comunica a la Sra. Butter que había dos expedientes que no se habían trabajado. Aún siendo esta aseveración una equivocada, la Sra. Butter le contesta que hará la carta de cierre de tales expedientes. La Lcda. Rivera de manera hostil entonces expresa: "no, aquí proceden dos cosas, dar seguimiento o cerrar la reclamación, y primero tienes que dar seguimiento". La Sra. Butter, por la ansiedad que le produjo este intercambio, prefirió quedarse callada y no entrar en controversia. Minutos después la Lcda. Rivera regresa al escritorio de la Sra. Butter para preguntarle sobre el expediente del Sr. Félix Colón Almodóvar. La Lcda. Rivera comienza, de manera ruda y haciendo expresiones faciales, a buscar fechas en el expediente y a increparle a la Sra. Butter por una supuesta información que no se la había brindado. La Lcda. Rivera cierra esta conversación diciéndole a la Sra. Butter que cuando ella solicite cualquier información la respuesta debe ser inmediata y que la determinación de dicho caso se tenía que realizar ese día. La Sra. Butter mantuvo silencio, mientras la Lcda. Rivera finiquitó de manera altiva diciendo: "¿estamos?". Todo esto ocurrió frente a las restantes empleadas. La Sra. Butter se sintió humillada, intimidada y muy ansiosa.

146. Respecto al párrafo 95 de su Querella, Butter declaró que ella presume que este asunto es en respuesta a su queja de julio de 2020, que había sido presentada hacía ya casi un año.

147. Respecto al párrafo 95 de su Querella, Butter admitió que se trata de una situación en la cual se le está llamando la atención por un asunto relacionado con sus funciones en el empleo.

148.   Respecto al párrafo 95 de su Querella y a su alegación de que la Lcda. Rivera estaba buscando fechas "de manera ruda y haciendo expresiones faciales", Butter declaró que se refiere que, mientras la Lcda. Rivera pasaba las páginas, estaba levantando las cejas.

149.   Respecto al párrafo 95 de su Querella, Butter admitió que no hay impedimento alguno a que la Lcda. Rivera solicite que un asunto como este se tramite de manera inmediata, como ocurrió.

150.   En el párrafo 96 de su Querella, Butter alegó:

El 9 de julio de 2021, la Lcda. Rivera de forma temperamental pone un expediente en el escritorio de la Sra. Butter y dice: "esto tiene que salir ahora y cuando el cheque esté listo llama al agente, por si quiere venirlo a buscar". Luego, la Lcda. Rivera, mientras se alejaba del escritorio, manifiesta: "¿me escuchaste?". Se repite el patrón de maltrato verbal y abusivo por parte de la Licenciada.

151.   Respecto al párrafo 96 de su Querella, Butter admitió nuevamente que no hay impedimento alguno a que la Lcda. Rivera solicite que un asunto como este se tramite con urgencia.

152.   Respecto al párrafo 96 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

153.   En los párrafos 97 y 98 de su Querella, Butter alegó:

El 9 de julio de 2021, la Lcda. Rivera le solicita mediante correo electrónico a la Sra. Butter que realice una tabla para ser presentada en una reunión de directivos. La Sra. Butter le contesta que no podía realizarla en ese momento porque no tenía la aplicación de donde se sustrae la información. Ante esto, la Lcda. Rivera le responde a la Sra. Butter que como supervisora ésta debía contar con dicho acceso. La Sra. Butter le explica que dicha aplicación no era parte de sus actividades diarias debido a que la propia Lcda. Rivera la había sustituido en dicha tarea. Aún con esta explicación, la Lcda. Rivera procedió a indicarle a la Sra. Butter que no tener la aplicación constituía un error de juicio. La Sra. Butter abatida porque continuamente se le ataca por sus funciones sólo manifestó que difería y que no abundaría al respecto. Luego de este intercambio de correos electrónicos el 9 de julio de 2021, la Lcda. Rivera le grita a la Sra. Butter que se dirija a su oficina mientras señalaba una silla. La Sra. Butter con su cabeza hace el gesto de que no irá, evidentemente la actitud intimidatoria de la Lcda. Rivera produjo temor en la Sra. Butter. La Licenciada, luego de la negativa comparte expresiones como: "yo te estoy dando una instrucción y te digo que vengas", "¿quién es la manager aquí, tu o yo?".

154.   Respecto a los párrafos 97 y 98 de su Querella, Butter admitió que aquí se trata de una

situación en la cual su supervisora (la Lcda. Rivera) le ordenó a Butter a que viniera a su escritorio a discutir un asunto, y que Butter no obedeció la orden y le dijo que no iba a ir a su escritorio porque no tenía más nada que abundar sobre el tema. A esos efectos, Butter admitió que, cuando la Lcda. Rivera le preguntó "¿Pero quién es la supervisora aquí, tú o yo?", Butter le contestó lo siguiente: "Usted es la supervisora, pero yo no tengo nada más que hablar al respecto".

155. Respecto a los párrafos 97 y 98 de su Querella, Butter declaró que el asunto "ya se había aclarado en los emails" y que "el tema ya estaba concluido". No obstante, Butter admitió que desconoce si la razón por la que la Lcda. Rivera le pidió que viniera a su escritorio era para que repitiera lo mismo que se había dicho en los e-mails o si la Lcda. Rivera le quería hacer preguntas sobre el asunto.

156. a los párrafos 97 y 98 de su Querella, Butter admitió que se trata de una situación que tiene que ver con un asunto que era relacionado con sus funciones de empleo.

157. Butter admitió en su deposición que desconoce lo que la Lcda. Rivera quería lograr, si algo, con las represalias que Butter alega que la Lcda. Rivera estaba tomando contra ella.

158. Butter admitió que ella no fue despedida de su empleo y que tampoco recibió una carta de despido de su patrono.

159. Respecto a las alegaciones en su Querella Enmendada, Butter admitió que las mismas son similares a las de su Querella original, en el sentido de que se trata de asuntos que tenían que ver con sus funciones de empleo, y que las represalias que Butter alega son en cuanto al alegado trato que le dio la Lcda. Rivera.

160. Butter admitió que, en el periodo de tiempo que comprende las alegaciones de su Querella Enmendada (21 de julio de 2021 a 31 de mayo de 2022), a ella ni se le bajó el salario, ni se le cambió de puesto, ni se le dio amonestación escrita alguna.

161. Al preguntársele respecto a su alegación de que la Lcda. Rivera la "cargó de trabajo" Butter declaró que se refiere a que, a partir de enero de 2021, se le asignó trabajar con unos manuales de las líneas de negocio. Al preguntársele a Butter si ella, como supervisora, no tenía discreción para distribuir esa tarea entre sus supervisadas, respondió que no. Al preguntársele en qué se basa para dicha aseveración, contestó que se basa en que la solicitud se le dirigió a ella.

162. Butter admitió que sus alegaciones de sobrecarga de trabajo en la Querella y en la Querella Enmendada no la llevaron a sentirse que tenía que renunciar a su puesto.

163. Al preguntársele respecto a su alegación de que la Lcda. Rivera utilizaba un tono fuerte al

hablar, Butter declaró que se refiere a "[q]ue no es un tono pasivo, amable".

164.     Butter admitió que el 31 de mayo de 2022 fue la fecha en que ella decidió que tenía que renunciar y que, previo a esa fecha, ella entendía que podía seguir manejando la situación.

165.     En el párrafo 13 de su Querella Enmendada, Butter alegó: El 13 de septiembre de 2021, la Sra. Melitza Santiago tuvo un percance de salud. La Lcda. Rivera le envió un correo electrónico a la Sra. Butter indicándole que todo el trabajo de la Sra. Santiago quedaría en su responsabilidad hasta que esta se incorporara al trabajo. Amplio y excesivo aumento de trabajo.

166.     Respecto al párrafo 13 de su Querella Enmendada, Butter admitió que Melitza Santiago estuvo fuera desde diciembre de 2020 hasta febrero de 2021. Butter también admitió que ella no distribuyó las funciones de Melitza Santiago entre sus supervisadas, y que la Lcda. Rivera no le impidió hacerlo.

167.     Butter admitió que nunca le preguntó a la Lcda Rivera si podía dividir el trabajo entre las demás empleadas, ello a pesar de que eso era algo que Butter sí hacía antes de que la Lcda. Rivera llegara a la división.

168.     Butter admitió que, antes de llegar la Lcda. Rivera, ella tenía un sistema que le funcionaba como supervisora; que la Lcda. Rivera le asignó una tarea similar a la que ella manejaba de una manera distinta; y que Butter nunca le informó a la Lcda. Rivera sobre cómo ella manejaba eso antes de que ella llegara, ni tampoco le informó que lo podía hacer de esa manera durante la ausencia de Melitza Santiago.

169.     Butter nunca le sugirió a la Lcda. Rivera manejar los asuntos de la división en la manera en que Butter los manejaba anteriormente.

170.     Butter admitió que no se quejó ante Recursos Humanos respecto a la alegada sobrecarga de trabajo.

171.     El 27 de enero de 2021, Butter recibió un correo electrónico de la señora Tamara Aponte, empleada de la Oficina de Apelaciones del Departamento del Trabajo, con un señalamiento de vista. Butter respondió a ese correo acusando recibo y copiando a la dirección de correo electrónico claimslife@universalpr.com.

172.     Ese mismo día, la Lcda. Rivera le envió un correo electrónico a Butter respecto a lo anterior, indicándole lo siguiente: "Como hemos hablado, favor remitirme los señalamientos de vista para poder comparecer". A esta comunicación, Butter contestó: "Solo confirme [sic] el recibo del documento y copia [sic] a claimslife, para su conocimiento". La Lcda. Rivera le respondió reiterando su correo anterior, ya que, si el correo se envía al e-mail de claimslife en vez de al email

de la Lcda. Rivera, la Lcda. Rivera no necesariamente lo ve, lo cual podía resultar en que la Lcda. Rivera incurra en incomparecencia de algún señalamiento.

173. Dos días más tarde, Butter le contestó a la Lcda Rivera que la Lcda. Rivera supuestamente no había hablado con ella y que, para evitar que la Lcda. Rivera incurra en incomparecencia a alguna vista, Butter le iba a decir a la señora Tamara Aponte (la empleada del Departamento del Trabajo) que le envíe los señalamientos a la Lcda. Rivera.

174. Ante la respuesta de Butter, la Lcda. Rivera le recordó que, desde que comenzó como Gerente de la División hacía más de un año, le había solicitado a Butter que le envíe todos los señalamientos, y que era penoso e inverosímil que se suscite una cadena de correos electrónicos sobre una instrucción tan sencilla.

175. Tanto el 13 de septiembre de 2019 como el 30 de septiembre de 2019, Butter había cumplido con la directriz de notificarle a la Lcda. Rivera respecto a señalamientos.

176. El 16 de marzo de 2021, la Lcda. Rivera le envió a Butter un correo electrónico en el cual le trajo a su atención que había una reclamación que se recibió el 23 de noviembre de 2020, y que no fue hasta tres meses más tarde, el 8 de febrero de 2020, que Butter le solicitó a los beneficiarios información del tratamiento médico de la asegurada. La Lcda. Rivera le indicó a Butter que "[s]obre esta dilación, innecesaria, en el trámite de las reclamaciones hemos tenido varias conversaciones, por lo que no es aceptable que continúe sucediendo.

177. El 12 de abril de 2021, la Lcda. Rivera le envió un correo electrónico a Butter solicitando que le deje saber si hay alguna aplicación o sistema que no estaba en la computadora de Butter y que era necesaria para llevar a cabo sus funciones. Luego de que la Lcda. Rivera diera seguimiento al día siguiente, Butter contestó que las tenía todas, y la Lcda. Rivera respondió: "Excelente. Por favor, de ocurrir nuevamente que nos quedemos sin sistema, agradezco me notifiques, para poderte asistir y que no te veas impedida de realizar tu trabajo".

178. Entre el 28 de abril de 2021 y el 7 de mayo de 2021, Butter y la Lcda. Rivera intercambiaron una serie de correos electrónicos respecto al caso GL/ADD 1099-0221 y unos borradores de denegatoria que Butter preparó. El 28 de abril de 2021, la Lcda. Rivera le señaló a Butter, respecto a un borrador con fecha del 27 de abril de 2021, que su análisis del caso no había contemplado la totalidad de las disposiciones de la póliza referentes al proof of claim o proof of waiver. Butter le respondió a Lcda. Rivera solicitando que abundara más, y la Lcda. Rivera respondió que la denegatoria de beneficios que preparó Butter no estaba basada en las disposiciones de la póliza referente a proof of claim, y que esto no se trataba de un asunto novel.

179. Ante lo señalado por la Lcda. Rivera, Butter preparó un borrador de carta de denegatoria con fecha de 3 de mayo de 2021. Al día siguiente, la Lcda. Rivera le devolvió el caso a Butter y le indicó que, aunque la carta reproducía las disposiciones de la póliza a los efectos de que no necesariamente se había perdido el derecho a reclamar, la carta no le indicaba eso al reclamante. La Lcda. Rivera le explicó a Butter que la carta tenía que indicar que, si bien se denegaba la reclamación por tardía, podía solicitar reconsideración y allí exponer los motivos de la radicación tardía.

180. Butter preparó otro borrador de carta con fecha de 6 de mayo de 2021. Al recibirlo, la Lcda. Rivera le respondió a Butter que, nuevamente, estaba incorrecta, ya que se eliminaron las disposiciones del proof of waiver y también se eliminó el apercibimiento sobre el derecho a solicitar reconsideración.

181. El 7 de mayo de 2021 la Lcda. Rivera le envió a Butter otro correo electrónico (en esta ocasión, respecto al caso número D6661), en el que destacó que en este caso Butter tampoco le apercibió al reclamante del derecho a solicitar reconsideración, conforme lo requiere el Código de Seguros.

182. El 20 de mayo de 2021 la Lcda. Rivera le escribió dos correos electrónicos a Butter con relación al mismo caso (#GL479) por hacer una adjudicación de beneficios incorrecta.

183. El 25 de mayo de 2021 la Lcda. Rivera le escribió otro correo electrónico a Butter respecto a otra adjudicación de beneficios incorrecta, en el caso #GL4736.

184. El 28 de mayo de 2021, la Lcda. Rivera le escribió un correo electrónico a Butter respecto a varios errores cometidos en una carta de denegatoria en reconsideración respecto al caso #S2-1824. La Lcda. Rivera destacó que, tratándose de una denegatoria de una reconsideración, tenía que eliminarse el derecho a reconsideración de la carta. También destacó que, como el planteamiento en reconsideración era que las incapacidades parciales estaban cubiertas, había que indicar en la carta que la póliza no cubría tales incapacidades.

185. El 4 de junio de 2021 la Lcda. Rivera le escribió un correo electrónico a Butter otro correo electrónico respecto al caso #GL4736, en el que anteriormente Butter había hecho adjudicaciones incorrectas. En este correo, la Lcda. Rivera le apercibió a Butter que había advenido en conocimiento de que, recientemente, en un expediente que la Lcda. Rivera ya había firmado y aprobado, se había alterado con líquido corrector, práctica que no está permitida.

186. Al preguntársele a Butter por qué alega que se vio obligada a renunciar, contestó: "Porque nadie me podía ayudar".

187. El 22 de junio 2020 la Lcda. Rivera le emitió una amonestación escrita a Butter en la que expuso una serie de faltas que había cometido Butter. Por su parte, Butter respondió por escrito a esta amonestación el 10 de julio de 2020. Diez días más tarde, presentó su queja en Recursos Humanos por "represalia, discrimen y erosión de funciones".

188. Una vez recibida la queja, se acordó con Butter que se llevaría a cabo un proceso de investigación. Completado el mismo, las señoras Gladymar Julbe y Carmen Figueroa, ambas Assistant Vice President de Recursos Humanos, sostuvieron una reunión con Butter el 14 de septiembre de 2020, de la cual se preparó una Minuta.

189. Durante la reunión del 14 de septiembre de 2020 respecto a la respuesta de Butter a la amonestación que se le cursó, se le indicó a Butter que había una serie de señalamientos que tuvieron un impacto operacional e impactaron su desempeño, y que los señalamientos que le hizo su supervisora no tenían que ver con represalias, sino con área de oportunidad que debía corregir porque, de lo contrario, afectaría su desempeño.

190. Durante la reunión del 14 de septiembre de 2020 la señora Carmen Figueroa hizo referencia a la reunión anterior que se había sostenido con Butter y con la Lcda. Rivera, en la cual habían acordado mejorar la comunicación. Butter le contestó a Figueroa que ella sintió que en esa reunión no se acordó nada. No obstante, Figueroa le contestó que Butter había dicho en esa reunión que estaba de acuerdo.

191. Durante la reunión del 14 de septiembre de 2020, respecto al alegado "acoso y ambiente hostil", se le indicó a Butter que, en toda la evidencia que ella había presentado, no había razón para concluir que había acoso ni ambiente hostil. Se destacó que, en todos los correos electrónicos, la Lcda. Rivera se dirige a Butter de forma respetuosa y profesional al hacerle señalamientos por no seguir los procedimientos establecidos, por errores y para recordarle las reglas del área. También se destacó que se desprendía de la investigación realizada, incluyendo entrevistas a dos empleadas del área, que habían ocasiones en que Butter usaba un tono de voz alto al dirigirse a la Lcda. Rivera. También se destacó que Butter constantemente no es receptiva ante los señalamientos, y que no tiene una comunicación efectiva ni con la Lcda. Rivera ni con sus subalternas.

192. Durante la reunión del 14 de septiembre de 2020, respecto a la alegación de discrimen, se le informó a Butter que no había evidencia alguna de discrimen y que debía ser más cuidadosa al hacer imputaciones tan serias. Butter admitió posteriormente en su deposición que ella no tenía prueba alguna de su alegación de discrimen.

193. Durante la reunión del 14 de septiembre de 2020, respecto a la alegada degradación de funciones, se le indicó a Butter que todos los cambios surgen para mejoras en el departamento, y

que sus tres empleadas subalternas confirmaron que, desde que la Lcda. Rivera se integró al grupo, ha mejorado algunos procesos y las hace partícipe de los mismos. También se le indicó que la Lcda. Rivera, como supervisora, es responsable de los aspectos operacionales y que, si encuentra algún asunto incorrecto, es su deber señalárselo a Butter.

194.    Durante la reunión del 14 de septiembre de 2020, Butter no aceptó sus errores, y tampoco refutó el señalamiento que se le hizo en cuanto a la ocasión en que le alzó la voz a la Lcda. Rivera.

195.    Durante la reunión del 14 de septiembre de 2020, al preguntársele sobre qué alternativas ella veía para solucionar la situación, Butter no identificó ninguna. Se le hizo énfasis en que evaluara una alternativa viable para solucionar su situación en el ámbito laboral y que se dialogara nuevamente para evaluar lo que ella propusiera. También se le enfatizó que era importante resolver la situación por su bienestar y la de su equipo de trabajo.

196.    El 14 de octubre de 2020, la señora Gladymar Julbe, Assistant Vice President de Recursos Humanos, le envió un comunicado a Butter titulado "Cierre de Investigación", en el que se indicó que se habían atendido sus señalamientos y que se habían tomado las medidas internas para el buen funcionamiento de ella, su supervisora y el equipo de trabajo. También se le recordó que, conforme a las políticas de la compañía, no podían tomarse represalias contra empleados que presenten quejas en Recursos Humanos, por lo que se le indicó a Butter que, de surgir cualquier situación, se lo notifique inmediatamente a Recursos Humanos.

También determinó que los siguientes hechos se encuentran en controversia:

1. Si en su rol como Supervisora de Reclamaciones del Área de Vida, Butter tenía que supervisar a múltiples empleados lo que incluía darles seguimiento en cuanto a asuntos pendientes (verbalmente y por escrito), así como llamarle la atención a sus subalternos cuando fuera necesario.

2. Si el asunto que Butter alega en el párrafo 18 de su Querella supuestamente ocurrió el 20 de febrero de 2020, o sea, más de dos (2) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

3. Si respecto al párrafo 18 de su Querella, Butter admitió que se trata de una situación en la cual la Lcda. Rivera le llamó la atención a ella, por un asunto que tenía que ver con sus funciones de empleo.

4. Si respecto al párrafo 18 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

5. Si el asunto que Butter alega en el párrafo 20 de su Querella, supuestamente ocurrió el 2 de marzo de 2020, o sea, casi tres (3) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

6. Si respecto al párrafo 20 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

7. Si el asunto que Butter alega en el párrafo 21 de su Querella, supuestamente ocurrió el 6 de marzo de 2020, o sea, casi tres (3) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

8. Si respecto al párrafo 21 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo, ni le amonestaron, respecto al asunto.

9. Si el asunto que Butter alega en el párrafo 22 de su Querella, supuestamente ocurrió el 15 de marzo de 2020, o sea, casi tres (3) meses después de que Butter se quejó en Recursos Humanos el 18 de diciembre de 2019 del alegado trato hostil de la Lcda. Rivera.

10. Si respecto al párrafo 22 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo, ni se le amonestó por este asunto.

11. Si el asunto que Butter alega en el párrafo 25 de su Querella, supuestamente ocurrió el 4 de mayo de 2020, o sea, casi cinco (5) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

12. Si respecto al párrafo 25 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

13. Si el asunto que Butter alega en el párrafo 26 de su Querella, supuestamente ocurrió el 19 de junio de 2020, o sea, seis (6) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

14. Si el asunto que Butter alega en el párrafo 28 de su Querella, supuestamente ocurrió el 29 de junio de 2020, o sea, más de seis (6) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

15. Si el asunto que Butter alega en el párrafo 29 de su Querella, supuestamente ocurrió el 2 de julio de 2020, o sea, más de seis (6) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

16. Si respecto al párrafo 29 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

17. Si el asunto que Butter alega en el párrafo 30 de su Querella, supuestamente ocurrió el 3 de julio de 2020, o sea, más de seis (6) meses después de que Butter se quejó en Recursos Humanos el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

18. Si respecto al párrafo 30 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

19. Si respecto al párrafo 32 de su Querella, Butter admitió que, según se desprende del párrafo 88 de su Querella, el comentario de "problema de comprensión de lectura" es uno que la Lcda. Rivera también se lo hizo a la Sra. Sonia Rodríguez, quien también era subalterna de la Lcda. Rivera.

20. Si respecto al párrafo 32 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

21. Si el asunto que Butter alega en el párrafo 33 de su Querella, supuestamente ocurrió el 10 de julio de 2020, o sea, casi siete (7) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

22. Si respecto al párrafo 33 de su Querella, Butter admitió que, fuera de sentirse humillada, lo allí expuesto no afectó los términos y condiciones de su empleo.

23. Si el asunto que Butter alega en el párrafo 35 de su Querella, supuestamente ocurrió el 13 de julio de 2020, o sea, casi siete (7) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

24. Si respecto al párrafo 35 de su Querella, Butter admitió que el asunto que le planteó la Lcda. Rivera tenía que ver con sus funciones de empleo.

25. Si los asuntos que Butter alega en los párrafos 36 y 37 de su Querella ocurrieron, respectivamente, el 16 y 17 de julio de 2020, o sea, siete (7) meses después de que Butter se quejó en Recursos Humanos, el 18 de diciembre de 2019, del alegado trato hostil de la Lcda. Rivera.

26. Si respecto a los párrafos 36 y 37 de Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

27. Si el asunto que Butter alega en el párrafo 41 de su Querella, supuestamente ocurrió el 25 de agosto de 2020, o sea, más de un mes después de que Butter se quejó en Recursos Humanos de

"represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

28. Si los asuntos que Butter alega en los párrafos 42 y 43 de su Querella, supuestamente ocurrieron el 8 y 9 de septiembre de 2020, o sea, más de un mes después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

29. Si respecto a los párrafos 42 y 43 de la Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

30. Si el asunto que Butter alega en el párrafo 54 de su Querella, supuestamente ocurrió el 19 de octubre de 2020, o sea, casi tres (3) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

31. Si el asunto que Butter alega en el párrafo 55 de su Querella, supuestamente ocurrió el 23 de octubre de 2020, o sea, más de tres (3) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

32. Si respecto al párrafo 55 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

33. Si el asunto que Butter alega en el párrafo 56 de su Querella, supuestamente ocurrió el 23 de octubre de 2020, o sea, más de tres (3) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

34. Si respecto al párrafo 56 de su Querella, Butter admitió nuevamente que no hay impedimento alguno a que una supervisora de área, como lo era la Lcda. Rivera, redistribuya funciones y/o asigne funciones que antes eran de un empleado a otro empleado.

35. Si respecto al párrafo 56 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

36. Si el asunto que Butter alega en el párrafo 58 de su Querella, supuestamente ocurrió el 26 de octubre de 2020, o sea, más de tres (3) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

37. Si respecto al párrafo 58 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

38. Si el asunto que Butter alega en el párrafo 60 de su Querella, supuestamente ocurrió el 2 de noviembre de 2020, o sea, más de tres (3) meses después de que Butter se quejó en Recursos

Humanos de "represalia, discrimen y erosión de funciones" el 20 de julio de 2020.

39. Si respecto a la última oración del párrafo 60 de la Querella, donde Butter alega que la "carga de trabajo" "excedía su horario de trabajo regular", Butter admitió que ella era una empleada exenta y que eso implica a veces trabajar más allá del horario regular.

40. Si respecto al párrafo 60 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

41. Si el asunto que Butter alega en el párrafo 61 de su Querella, supuestamente ocurrió el 9 de noviembre de 2020, o sea, más de tres (3) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

42. Si respecto al párrafo 61 de su Querella, Butter inicialmente declaró que en Universal Life no se condona que los empleados atiendan llamadas personales. Posteriormente, declaró que desconoce si se permite o no.

43. Si el asunto que Butter alega en el párrafo 64 de su Querella supuestamente ocurrió el 12 de noviembre de 2020, o sea, casi cuatro (4) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones" el 20 de julio de 2020.

44. Si respecto al párrafo 64 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

45. Si el asunto que Butter alega en el párrafo 65 de su Querella, supuestamente ocurrió el 13 de noviembre de 2020, o sea, casi cuatro (4) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

46. Si respecto al párrafo 65 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

47. Si el asunto que Butter alega en el párrafo 66 de su Querella, supuestamente ocurrió el 2 de diciembre de 2020, o sea, más de cuatro (4) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

48. Si respecto a la alegación en el párrafo 66 de la Querella de que "se enter[ó] de asuntos importantes de forma indirecta", Butter admitió que, aunque no se acuerda específicamente qué asuntos eran, se trata de asuntos de los cuales ella se enteró y que esta situación no tuvo ningún efecto negativo, en términos de ella poder cumplir con sus funciones ni con instrucción alguna.

49. Si respecto al párrafo 66 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

50. Si el asunto que Butter alega en el párrafo 67 de su Querella, supuestamente ocurrió el 2 de diciembre de 2020, o sea, más de cuatro (4) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

51. Si respecto al párrafo 67 de su Querella, Butter admitió nuevamente que la Lcda. Rivera, como persona a cargo del área, tenía la discreción de redistribuir funciones y ajustar procedimientos.

52. Si el asunto que Butter alega en el párrafo 68 de su Querella, supuestamente ocurrió el 16 de diciembre de 2020, o sea, casi cinco (5) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

53. Si respecto al párrafo 68 de su Querella, Butter admitió nuevamente que ella era una empleada exenta y que pudiera tener que trabajar en exceso de las horas establecidas.

54. Si respecto al párrafo 68 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo

55. Si el asunto que Butter alega en el párrafo 69 de su Querella supuestamente ocurrió el 17 de diciembre de 2020, o sea, casi cinco (5) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones" el 20 de julio de 2020.

56. Si respecto al párrafo 69 de su Querella, Butter admitió que la razón por la cual ella no pudo trabajar remoto no fue porque la Lcda. Rivera se lo impidió, sino que fue porque su esposo salió de viaje y se llevó la única "laptop" que había en casa de Butter. Siendo eso así, Butter admitió que ni la Lcda. Rivera ni Universal tuvieron nada que ver con la situación de que ella no pudo trabajar remoto.

57. Si respecto al párrafo 69 de su Querella, aunque Butter declaró que ella "podía hacer trabajo de análisis sin computadora desde mi casa", admitió que ella no solicitó que se le permita hacer ese tipo de trabajo, ni tampoco se quejó de que no le permitieran hacer el trabajo de esa manera.

58. Si en el correo electrónico que Butter le envió a la Lcda. Rivera, el 17 de diciembre de 2020, se limitó a informar que, como su esposo tenía que dar unos seminarios en Europa y usar su "laptop" allí, ella no tendría la herramienta para trabajar remoto. La Lcda. Rivera le indicó que, ante lo informado, tendría que trabajar presencial. A ese correo, Butter se limitó a contestar lo siguiente: "Ok. Gracias".

59. Si respecto al párrafo 69 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

60. Si el asunto que Butter alega en el párrafo 70 de su Querella, supuestamente ocurrió el 23 de diciembre de 2020, o sea, más de cinco (5) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

61. Si respecto al párrafo 70 de su Querella, Butter admitió que lo allí expuesto no afectó los términos y condiciones de su empleo.

62. Si el asunto que Butter alega en el párrafo 71 de su Querella supuestamente ocurrió el 11 de enero de 2021, o sea, casi seis (6) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

63. Si respecto al párrafo 71 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

64. Si el asunto que Butter alega en el párrafo 73 de su Querella, supuestamente ocurrió el 1 de febrero de 2021, o sea, más de seis (6) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

65. Si respecto al párrafo 73 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

66. Si respecto al párrafo 74 de su Querella, Butter admitió que lo que ocurría en ocasiones era que la Lcda. Rivera llegaba al área y decía "Buenos días", en voz alta para todo el mundo.

67. Si el asunto que Butter alega en el párrafo 76 de su Querella, supuestamente ocurrió el 9 de febrero de 2021, o sea, más de seis (6) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

68. Si el asunto que Butter alega en el párrafo 77 de su Querella, supuestamente ocurrió el 12 de febrero de 2021, o sea, casi siete (7) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

69. Si respecto al párrafo 77 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

70. Si los asuntos que Butter alega en los párrafos 78 y 79 de su Querella, supuestamente ocurrieron el 22 de febrero y 5 de marzo de 2021, o sea, más de siete (7) meses después de que Butter se quejó en Recursos Humanos de

"represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

71. Si el asunto que Butter alega en el párrafo 80 de su Querella supuestamente ocurrió el 10 de marzo de 2021, o sea, más de siete (7) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones" el 20 de julio de 2020.

72. Si respecto al párrafo 80 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

73. Si respecto al párrafo 82 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

74. Si el asunto que Butter alega en el párrafo 85 de su Querella, supuestamente ocurrió el 30 de abril de 2021, o sea, más de nueve (9) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

75. Si respecto al párrafo 85 de su Querella, Butter admitió que no tuvo problema alguno en seguir trabajando asuntos de SINOT, luego de esta situación, y que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

76. Si el asunto que Butter alega en el párrafo 86 de su Querella, supuestamente ocurrió el 4 de mayo de 2021, o sea, más de nueve (9) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

77. Si respecto al párrafo 86 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

78. Si el asunto que Butter alega en el párrafo 90 de su Querella supuestamente ocurrió el 20 de mayo de 2021, o sea, diez (10) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

79. Si el asunto que Butter alega en el párrafo 94 de su Querella supuestamente ocurrió el 7 de julio de 2021, o sea, más de once (11) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones" el 20 de julio de 2020.

80. Si respecto a la última oración del párrafo 94 de su Querella, donde Butter alega que "[l]a Lcda. Rivera abiertamente compartió el caso de la señora Butter atacando su dignidad y aumentando el ambiente hostil", Butter admitió que esto es una especulación de ella, y que ella no tiene hecho alguno para probar esta alegación.

81. Si el asunto que Butter alega en el párrafo 95 de su Querella, supuestamente ocurrió el 8 de julio de 2021, o sea, más de once (11) meses después de que Butter se quejó, en Recursos Humanos de "represalia, discrimen y erosión de funciones", el 20 de julio de 2020.

82. Si el asunto que Butter alega en el párrafo 96 de su Querella supuestamente ocurrió el 9 de julio de 2021, o sea, más de once (11) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones" el 20 de julio de 2020.

83. Si respecto al párrafo 96 de su Querella, al preguntársele a Butter a qué se refiere con que la Lcda. Rivera puso un expediente "de forma temperamental", Butter declaró que lo hizo "de forma hostil, agresiva". Si, no obstante, admitió que la Lcda. Rivera no tomó ningún tipo de acción física y que esta alegación es su percepción.

84. Si los asuntos que Butter alega en los párrafos 97 y 98 de su Querella, supuestamente ocurrieron el 9 de julio de 2021, o sea, más de once (11) meses después de que Butter se quejó en Recursos Humanos de "represalia, discrimen y erosión de funciones" el 20 de julio de 2020.

85. Si respecto a los párrafos 97 y 98 de su Querella, Butter admitió que, fuera de lo emocional, lo allí expuesto no afectó los términos y condiciones de su empleo.

86. Si Butter admitió que la última vez que ella discutió con alguien de Recursos Humanos su situación en el empleo, en cuanto al trato de la Lcda. Rivera, fue el 18 de septiembre de 2020, y que su próximo contacto con Recursos Humanos fue para anunciar su decisión de renunciar, el 31 de mayo de 2022.

87. Si, respecto a la queja de trato hostil que Butter presentó en diciembre de 2019, la señora Carmen Figueroa, Assistant Vice President de Recursos Humanos, emitió un Informe de Investigación, el 28 de febrero de 2020. Si, según se desprende del Informe, en la reunión sostenida con Butter y la Lcda. Rivera, se establecieron los roles y ambas expresaron como se sentían con la actitud que percibían una de la otra.

88. Si, según el Informe, Butter se quejó de que la Lcda. Rivera impartía instrucciones ambiguas, mientras que la Lcda. Rivera se quejó de que Butter no seguía instrucciones; y ambas se quejaron mutuamente de "hablarse de forma negativa" así como de "ambiente hostil".

89. Si según el Informe, en el diálogo entre Butter y la Lcda. Rivera, llegaron a una serie de acuerdos, incluyendo tener reuniones semanales para dialogar sobre el área; comunicarse sin altanerías y con respeto; y, si había situaciones entre ellas, dialogarlo con un supervisor.

Conforme a lo anterior, decretó **Sin Lugar** la petición de sentencia sumaria de Universal, por entender que no existe una certeza sobre los hechos en controversia. En consecuencia, determinó que el pleito debía dilucidarse mediante juicio en su fondo.

Inconforme con lo resuelto, Universal acudió ante este tribunal intermedio y señaló la comisión de los siguientes tres errores:

A.  **PRIMER ERROR:** ERRÓ EL TPI AL INCUMPLIR CON SU OBLIGACIÓN BAJO RAMOS PÉREZ V. UNIVISION DE REVISAR LA EVIDENCIA DOCUMENTAL ANTE SU CONSIDERACIÓN, Y AL DAR POR "CONTROVERTIDOS" HECHOS POR EL MERO HECHO DE QUE LA PROMOVIDA DIJO EN SU OPOSICIÓN QUE ESTABAN EN CONTROVERSIA, ELLO A PESAR DE QUE NO FUERON DEBIDAMENTE CONTROVERTIDOS.

B.  **SEGUNDO ERROR:** ERRÓ EL TPI AL NEGARSE A DESESTIMAR LA RECLAMACIÓN DE DESPIDO CONSTRUCTIVO, CONTRARIO A LO RESUELTO EN RIVERA FIGUEROA V. THE FULLER BRUSH CO. Y LEÓN TORRES V. RIVERA LEBRÓN, ANTE UN RÉCORD HUÉRFANO DE HECHOS QUE DEN PIE A UN DESPIDO CONSTRUCTIVO.

C.  **TERCER ERROR:** ERRÓ EL TPI AL NEGARSE A DESESTIMAR LA RECLAMACIÓN DE REPRESALIAS, ANTE LA AUSENCIA DE ACCIÓN ADVERSA ALGUNA NI DE LOS ELEMENTOS NECESARIOS PARA ESTABLECER UNA RECLAMACIÓN BAJO LA LEY 115-1991.

Oportunamente, la Recurrida presentó su alegato en oposición. Así pues, con el beneficio de la comparecencia de las partes, resolvemos.

-II-

**A. Certiorari**

El auto de *certiorari* es el vehículo procesal que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior.[11] Distinto al recurso de apelación, el tribunal de superior jerarquía tiene la facultad de expedir el auto de *certiorari* de manera discrecional, por tratarse de ordinario de asuntos interlocutorios.[12]

---

[11] *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 728 (2016).
[12] *Pueblo v. Díaz de León*, 176 DPR 913, 918 (2009); *García v. Padró*, 165 DPR 324, 334 (2005).

Al presentarse un recurso de *certiorari* de naturaleza civil ante nosotros, es preciso evaluarlo a la luz de la Regla 52.1 de Procedimiento Civil.[13] La norma procesal regula todo lo relacionado a la revisión de sentencias y resoluciones dictadas por el Tribunal de Primera Instancia.[14] Dicha regla limita la autoridad de este Tribunal para revisar las órdenes y resoluciones interlocutorias dictadas por los tribunales de instancia por medio del recurso discrecional de *certiorari*. Posterior a su aprobación, la regla fue enmendada nuevamente por la Ley 177-2010, que dispone como sigue:

> Todo procedimiento de apelación, *certiorari*, certificación, y cualquier otro procedimiento para revisar sentencias y resoluciones se tramitará de acuerdo con la ley aplicable, estas reglas y las reglas que adopte el Tribunal Supremo de Puerto Rico.
>
> El recurso de *certiorari* para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión.
>
> Cualquier otra resolución u orden interlocutoria expedida por el Tribunal de Primera Instancia podrá ser revisada en el recurso de apelación que se interponga contra la sentencia sujeto a lo dispuesto en la Regla 50 de este apéndice sobre los errores no perjudiciales.[15]

Establecido lo anterior, es preciso recordar que, si bien el auto de *certiorari* […] es un vehículo procesal

---

[13] 32 LPRA Ap. V, R.52.1.
[14] *Mun. de Caguas v. JRO Construction*, 201 DPR 703, 709 (2019).
[15] 32 LPRA Ap. V, R.52.1

discrecional, la discreción del tribunal revisor no debe hacer abstracción del resto del derecho.[16] Sin embargo, esta debe ejercerse de manera razonable, procurando siempre lograr una solución justiciera.[17]

La discreción judicial "no se da en un vacío ni en ausencia de unos parámetros".[18] Recordemos que, a fin de que el Tribunal de Apelaciones pueda ejercer su discreción de manera prudente, la Regla 40 de su Reglamento, 4 LPRA Ap. XXII-B, R. 40, establece los criterios que dicho foro debe considerar al determinar si procede o no expedir un auto de *certiorari*.[19] En particular, esta Regla dispone los siguientes criterios:

A. Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

B. Si la situación de hechos planteada es la más indicada para el análisis del problema.

C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

F. Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.[20]

---

[16] *Mun. de Caguas v. JRO Construction*, supra, pág. 711; *IG Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012); *Pueblo v. Rivera Santiago*, 176 DPR 559, 580 (2009); *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 98 (2008); *García v. Padró*, supra, pág. 335.
[17] *Mun. de Caguas v. JRO Construction*, supra, pág. 712; *IG Builders et al. v. BBVAPR,* supra; *Torres Martínez v. Torres Ghigliotty*, supra; *Negrón v. Srio. de Justicia*, 154 DPR 79, 91 (2001).
[18] *Mun. de Caguas v. JRO Construction*, supra*; IG Builders et al. v. BBVAPR,* supra; *Rivera Figueroa v. Joe's European Shop*, 183 DPR 580, 596 (2011).
[19] *Mun. de Caguas v. JRO Construction,* supra.
[20] 4 LPRA Ap. XXII-B, R. 40.

El TSPR ha manifestado, que los tribunales apelativos no deben intervenir con determinaciones emitidas por el foro primario y sustituir el criterio utilizado por dicho foro en el ejercicio de su discreción, salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad, incurrió en craso abuso de discreción, o que incurrió en error manifiesto.[21] Por tal razón, el ejercicio de las facultades discrecionales por el foro de instancia merece nuestra deferencia, salvo que incurra en algunas de las conductas previamente mencionadas.

**B. Procedimiento sumario bajo la Ley Núm. 2**

La Ley Núm. 2, provee un mecanismo procesal sumario con el fin de lograr la consideración y adjudicación rápida de las querellas que presentan empleados u obreros contra sus patronos.[22] Ello persigue la intención legislativa "de proteger el empleo, desalentando el despido sin justa causa y proveyendo al obrero así despedido los medios económicos para la subsistencia de éste y de su familia, en la etapa de transición entre empleos".[23]

En *Vizcarrondo Morales v. MVM, Inc.,* el Tribunal Supremo de Puerto Rico (TSPR) explicó que las disposiciones de la Ley Núm. 2 deben interpretarse de modo liberal a favor del empleado u obrero, por razón de la desigualdad de medios económicos entre las partes.[24] Por lo que, se le impone una carga procesal más onerosa

---

[21] *Citibank et al. v. ACBI et al.*, 200 DPR 724, 736 (2018).
[22] 32 LPRA sec. 3118; *Medina Nazario v. McNeil Healthcare LLC*, supra, págs. 731-732, citando a *Rivera v. Insular Wire Products Corp.*, 140 DPR 912, 923 (1996).
[23] *Medina Nazario v. McNeil Healthcare LLC*, supra.
[24] *Vizcarrondo Morales v. MVM, Inc.*, 174 DPR 921, 928-929 (2008).

al patrono, empero este no queda desprovisto de poder defender sus derechos.[25]

Ahora bien, la naturaleza sumaria del procedimiento es su característica esencial. Los tribunales están, por tanto, mandatados por la Ley Núm. 2 a exigir diligencia y prontitud en la tramitación de las reclamaciones bajo esta ley.[26] Conforme a este deber, el Foro máximo dispuso lo siguiente:

> […] [T]anto los tribunales como las partes deben respetar: (1) los términos relativamente cortos dispuestos en el estatuto para contestar la querella; (2) los criterios estrictos para conceder una prórroga para contestar la querella; (3) el mecanismo especial que flexibiliza el emplazamiento del patrono, y (4) entre otras particularidades provistas por la ley, las limitaciones en el uso de los mecanismos de descubrimiento de prueba. De no hacerlo, el procedimiento se convertiría en ordinario, lo cual sería incompatible tanto con el mandato legislativo de diligencia en el dictamen judicial, como con su carácter reparador.[27]

La Ley Núm. 2, dispone de términos más cortos que los provistos para procedimientos ordinarios. Por ejemplo, el patrono, una vez se le notifica mediante copia de la querella en su contra, deberá presentar su contestación por escrito dentro de los diez días siguientes a la notificación, si ésta se hiciera en el distrito judicial en que se promueve la acción.[28] Tanto es así que, en *Vizcarrondo Morales v. MVM, Inc.*, supra, el TSPR dispuso que un tribunal no tiene discreción para negarse a anotar la rebeldía a un patrono, pasado el término para que conteste la querella sin que ello ocurra y sin que haya solicitado prórroga. Específicamente, el TSPR sostuvo "… el tribunal sólo tiene la jurisdicción para anotar la rebeldía y dictar sentencia. En estos

---

[25] *Íd.*
[26] *Íd.*
[27] *Íd.*, pág. 929.
[28] 32 LPRA sec. 3120.

casos, el tribunal no puede ignorar la letra clara de la Ley Núm. 2, *supra*, y negarse a anotar la rebeldía".[29]

Asimismo, cualquier parte afectada por la sentencia final que, en su día, dicte el tribunal, tendrá un término jurisdiccional de diez días siguientes a la notificación para acudir mediante *certiorari* ante el Tribunal de Apelaciones y solicitar la revisión de los procedimientos.[30] Para acudir ante el Tribunal Supremo, tendrá veinte (20) días.[31]

Por otro lado, en *Dávila, Rivera v. Antilles Shipping, Inc.*, el TSPR aclaró que las resoluciones interlocutorias que emita un TPI no son revisables por este foro apelativo.[32] Lo anterior, con excepción de aquellos casos en que: (1) la resolución interlocutoria haya sido dictada por el tribunal de instancia de forma *ultra vires,* sin jurisdicción; (2) en aquellos casos extremos en que la revisión inmediata, en dicha etapa, disponga del caso en forma definitiva; o (3) cuando la revisión inmediata evite una "grave injusticia". Solo en estos casos podrá este Tribunal ejercer su facultad de revisar una resolución interlocutoria vía *certiorari*.[33]

Cónsono con la naturaleza sumaria de los procedimientos bajo la Ley Núm. 2, *supra*, y en lo pertinente al caso de marras, el TSPR determinó que en estos casos la parte tendrá el término de diez días para recurrir ante este Tribunal.[34] Si bien la Ley Núm. 2, *supra*, no provee un término para solicitar revisión de

---

[29] *Vizcarrondo Morales v. MVM, Inc.*, supra, pág. 936.
[30] 32 LPRA sec. 3121.
[31] *Íd.*
[32] *Dávila, Rivera v. Antilles Shipping, Inc.*, 147 DPR 483, 496-497 (1999).
[33] *Íd.*, págs. 497-498. Véase, *Ortiz v. Holsum*, 190 DPR 511, 517 (2014).
[34] *Medina Nazario v. McNeil Healthcare LLC*, supra, pág. 736.

una resolución interlocutoria, el TSPR explicó que este debía ser análogo al término provisto para solicitar la revisión de una sentencia o resolución final del TPI, pues aplicar el término de treinta (30) días establecido por la Regla 52.2 de Procedimiento Civil[35], resultaría en un "absurdo procesal".[36]

### C. Sentencia Sumaria

La sentencia sumaria es un remedio de carácter extraordinario y discrecional, el cual tiene como finalidad "propiciar la solución justa, rápida y económica de litigios civiles que no contengan controversias genuinas de hechos materiales".[37] Este mecanismo procesal no requiere la celebración de un juicio en su fondo, ya que, ante la inexistencia de controversias reales y sustanciales sobre hechos materiales, lo único que resta es dirimir las controversias de derecho.[38]

La Regla 36 de Procedimiento Civil de Puerto Rico regula todo lo relacionado a la sentencia sumaria[39]. La norma procesal permite a los tribunales dictar sentencia sumariamente cuando los hechos de un caso no están en controversia y el derecho favorece la posición de la parte que la solicita.[40]

Para adjudicar una controversia de manera sumaria, la parte que solicita el remedio deberá presentar "una

---

[35] 32 LPRA Ap. V, R. 52.2.
[36] *Medina Nazario v. McNeil Healthcare LLC*, supra, págs. 735-736. En atención al carácter sumario de la Ley Núm. 2, el TSPR también concluyó que "la figura de la *reconsideración interlocutoria* es incompatible con el procedimiento provisto por la Ley Núm. 2, *supra*". Lo anterior, debido a que "se daría la anomalía de proveer a las partes un término mayor para solicitar reconsideración que el provisto por la Ley Núm. 2, *supra*, para la revisión de determinaciones finales". (Énfasis en el original). *Íd.*
[37] *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601, 610 (2023); *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 128 (2012).
[38] *Const. José Carro v. Mun. Dorado*, supra; *Vera v. Dr. Bravo*, 161 DPR 308, 331 (2004).
[39] *Íd.*
[40] 32 LPRA Ap. V, R. 36.1.

moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente", ya sea sobre la totalidad de la reclamación o parte de ésta.[41]

Sin embargo, nuestro Tribunal Supremo ha sido enfático en que *solo procede que se dicte sentencia sumaria cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable* y el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia.[42]

A tenor, el promovente de la moción tiene que establecer su derecho con claridad y debe demostrar que no existe controversia en cuanto a ningún hecho material, o sea, sobre ningún componente de la causa de acción.[43] En segundo lugar, la parte que se opone está obligada a establecer la existencia de una controversia que sea real en cuanto a algún hecho material y, en ese sentido, no cualquier duda es suficiente para derrotar la solicitud de sentencia sumaria.[44]

De ordinario, los tribunales están impedidos de dictar sentencia sumaria en cuatro instancias: (1) cuando existan hechos materiales y esenciales controvertidos; (2) cuando hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) cuando de los propios documentos que acompañan la moción surge que existe una controversia sobre algún hecho material y

---

[41] *Íd.*
[42] *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981, 992 (2023); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109-110 (2015).
[43] *Meléndez González et al. v. M. Cuebas*, supra, pág. 110.
[44] *Íd.*; *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

esencial; o (4) cuando como cuestión de derecho no procede.[45]

En cuanto al estándar revisor del foro apelativo ante este tipo de moción, el Tribunal Supremo ha precisado que *el Tribunal de Apelaciones utilizará los mismos criterios que el TPI al determinar si procede una sentencia sumaria*.[46] En ese sentido, el foro apelativo se encuentra en la misma posición que el TPI al revisar estas solicitudes.[47] No obstante, el Tribunal intermedio deberá limitar su revisión en dos aspectos, "no puede tomar en consideración evidencia que las partes no presentaron ante el Tribunal de Primera Instancia y tampoco adjudicar los hechos materiales en controversia, ya que ello le compete al foro primario luego de celebrado un juicio en su fondo".[48]

Por último, en *Meléndez González v. M. Cuebas*, supra, el Tribunal Supremo recogió diversos aspectos importantes respecto a la revisión del Tribunal de Apelaciones de las mociones de sentencia sumaria. Entre estos, resaltan los siguientes:

> (1) su revisión es *de novo* y debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor;

> (2) debe revisar que tanto la Moción de Sentencia Sumaria como su Oposición cumplan con los requisitos de forma que establece la Regla 36 de Procedimiento Civil, supra;

> 3) en los casos de revisión de sentencias dictadas sumariamente, el Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia y, de haberlos, debe cumplir con exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

---

[45] *Serrano Picón v. Multinational Life Ins.*, supra, pág. 992; *Oriental Bank v. Perapi et al.*, 192 DPR 7, 26-27 (2014).
[46] *Meléndez González et al. v. M. Cuebas*, supra, pág. 114.
[47] *Íd.*, pág. 115.
[48] *Íd.*, pág. 118.

4) por último, de encontrar que los hechos materiales realmente están incontrovertidos, debe entonces revisar *de novo* si el TPI aplicó correctamente el Derecho a la controversia.[49]

-III-

Para la Peticionaria no existe controversia en cuanto a que la señora Butter no sufrió acción adversa alguna, ni impacto en los términos y condiciones de su empleo. También, alega que no existe prueba de hechos de "magnitud sustancial" que demuestre que hubo un despido constructivo. Asevera que, ante la inexistencia de evidencia que revele que se cometió el despido constructivo y las represalias que reclama la Recurrida, el TPI debió desestimar las reclamaciones.

Para sustentar su posición, arguye que la señora Butter admitió que los señalamientos de su supervisora responden a asuntos relacionados al desempeño de sus funciones. Ante esto, entiende que el TPI no cumplió su responsabilidad de revisar la prueba documental que le fue sometida y que demuestra que la Recurrida no pudo debatir los 285 hechos incontrovertidos que presentó mediante su moción de sentencia sumaria.

Por su parte, la parte recurrida argumenta que, debido a que el pleito ante nuestra consideración se sometió bajo el procedimiento sumario que dispone la Ley Núm. 2 de 17 de octubre de 1961, este Tribunal intermedio debe abstenerse de ejercer su facultad revisora y permitir que el proceso continue de manera que se cumpla con el propósito de dicha Ley.

No obstante, arguye que, además de la deposición que acompañó a la *Solicitud de Sentencia Sumaria*, existe prueba documental, como informes, memorandos y minutas

---

[49] *Íd.*, págs. 118-119.

del Departamento de Recursos Humanos de la Peticionaria que evidencia que los hechos enumerados en la petición están en controversia. En consecuencia, solicitó se declarara sin lugar la *Petición de Certiorari*.

Después de revisar las peticiones de ambas partes y los documentos que obran en autos, concluimos que el TPI no incurrió en prejuicio, parcialidad o error craso y manifiesto al examinar la prueba y determinar que existen controversias genuinas que ameritan ser dilucidadas en un juicio en su fondo.[50] Tampoco el recurso requiere la revisión inmediata de forma que se evite una grave injusticia.[51] Además, la etapa en que se presenta el recurso no es la más propicia para su consideración, pues existen elementos subjetivos de intención y credibilidad que no pueden resolverse de forma sumaria.[52]

En definitiva, no vemos que se configure alguna de las circunstancias determinadas en la Regla 40 del Reglamento del Tribunal de Apelaciones que justifique nuestra intervención en esta etapa. Por consiguiente, concluimos que el TPI no abusó de su discreción al denegar la *Solicitud de Sentencia Sumaria*.

-IV-

Por los fundamentos que anteceden, se deniega la expedición del auto de *certiorari*.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

*Lcda. Lilia M. Oquendo Solís*
*Secretaria del Tribunal de Apelaciones*

---

[50] Regla 40 (C) del Reglamento del Tribunal de Apelaciones, *supra*.
[51] *Dávila, Rivera v. Antilles Shipping, Inc.*, supra.
[52] Regla 40 (E), *supra*.